**UNITED STATES of America, Plaintiff,**

**v.**

**INTERNATIONAL BROTHERHOOD OF TEAMSTERS, et al., Defendants.**

**In re APPLICATION XXI OF the INDEPENDENT REVIEW BOARD.**

**88 Civ. 4486 (DNE).**

United States District Court, S.D. New York.

June 27, 1996.

---

Mary Jo White, United States Attorney for the S.D. N.Y. (Karen B. Konigsberg, Assistant United States Attorney, of counsel), for U.S.

Charles M. Carberry, Independent Review Board Chief Investigator, New York City (Celia A. Zahner, of counsel), for Independent Review Board.

Winston & Strawn, New York City (Steven B. Rissman, James Terry, Matthew C. Rueter, of counsel), for respondent Robert T. Simpson, Jr.

*OPINION & ORDER*

EDELSTEIN, District Judge:

This opinion emanates from the voluntary settlement of an action commenced by plaintiff United States of America ("the Government") against, *inter alia*, defendants International Brotherhood of Teamsters ("the IBT" or "the Union") and the IBT's General Executive Board embodied in the voluntary consent order entered March 14, 1989 ("Consent Decree"). Pursuant to the Rules and Procedures for Operation of the Independent Review Board for the International Brotherhood of Teamsters ("IRB Rules"), ¶ O, the Independent Review Board ("IRB") has made an application to this Court seeking approval of its decision in this matter.

Application XXI presents for this Court's review the decision of the IRB regarding disciplinary charges brought against Robert T. Simpson, Jr. ("Simpson"), a former International Trustee of the IBT and the former President of IBT Local 743 ("Local 743" or "the Local"), located in Chicago, Illinois. Because the record in this application is voluminous, this Court will summarize the factual and procedural background of Application XXI before turning to the substance of this application and the numerous objections through which Simpson challenges this application.

## BACKGROUND

On June 30, 1994, the IRB issued an investigative report concerning disciplinary charges it proposed against Simpson, and the evidence that supported these charges.[1] In this report, the IRB charged Simpson as follows:

From October 1989 to the present, while the principal officer of Local 743, you allowed and facilitated Donald Peters' continued representation of Local 743 and his continued involvement in IBT affairs, thereby bringing reproach upon the IBT and interfering with the Local's legal obligations in violation of Article II, Section 2(a) and Article XIX, Section 7(b)(1) and (5) of the IBT Constitution *to wit:*

As a result of the court-approved settlement agreement entered into by Donald Peters on March 14, 1989 in *United States v. International Brotherhood of Teamsters,* 88 Civ. 4486 (S.D.N.Y.), effective June 1, 1989 Donald Peters was prohibited from "any position as an officer, agent, representative or employee of the IBT or any IBT subordinate body...." Based upon this same court-approved settlement agreement, effective September 30, 1989 Donald Peters was prohibited from "all positions as a trustee, agent, representative or employee of any IBT-affiliated employee benefit fund...."

Despite these prohibitions on Donald Peters' involvement with Local 743 and any other IBT entity, subsequent to October 1, 1989, you allowed Donald Peters to act as a representative of Local 743 and to be involved in the affairs of Local 743 and other IBT entities. Such conduct included, but was not limited to, the following: providing Peters an office on Local 743 premises; allowing Peters to address a rally in 1990 of Local 743 members and a Local 743 shop stewards meeting in 1991; ap-

proving a resolution which authorized Local 743 to pay for Peters' expenses while he traveled representing Local 743; allowing Local 743 to pay for expenses in connection with meetings attended by you, Peters and others where union business was discussed; permitting Local 743 to pay for Peters' hotel expenses at the 1991 IBT Convention in Orlando, Florida; and condoning Peters presence at the 1993 Central Conference of Teamsters Convention in Las Vegas, Nevada.

(Independent Review Board, Proposed Charges Concerning Local 743 President and International Trustee Robert Simpson, Jr. ("Proposed Charges"), at 33–34 (June 30, 1994).) The IRB forwarded these charges and its report to the IBT on June 30, 1994.

By letter dated July 5, 1994, the IBT referred the charges against Simpson back to the IRB for adjudication. A hearing on the above-quoted charges was scheduled for November 3, 1994 ("the hearing"). On October 5, 1994, the IRB sent a Notice of Hearing ("the Notice"), a copy of the IRB investigative report with exhibits, and the IRB Operating and Hearing Rules to Simpson. The Notice informed Simpson that the purpose of the hearing was to determine whether the charges contained in the investigative report were supported by the evidence, and the Notice stated that Simpson would "be permitted to present any facts, evidence, or testimony that is relevant to the issues before the IRB." (Independent Review Board Notice of Hearing, at 1–2 (Oct. 5, 1994).) The Notice further informed Simpson that he had the right to be represented at the hearing by counsel or by an IBT member. *Id.* at 1.

In response to the Notice, Simpson requested that the IRB change the hearing date to accommodate a scheduling conflict.

---

**1.** The IRB is vested with broad investigatory and disciplinary powers. The IRB's investigatory authority is coextensive with that of the General President and the General Secretary–Treasurer under the IBT Constitution and applicable law. *See* February 2, 1994, Memorandum & Order [Compromise Agreements], 842 F.Supp. 1550, 1551–52 (S.D.N.Y.1994); *see also* August 19, 1991, Opinion & Order [IRB Rules Decision], 803 F.Supp. 761, 768 (S.D.N.Y.1992), *aff'd in*

*relevant part,* 998 F.2d 1101 (2d Cir.1993). Under the Consent Decree, the IRB must use this authority, among other things, to investigate allegations of corruption within the IBT, allegations of influence by La Cosa Nostra ("LCN") or other organized crime groups upon IBT members or activities, and any failure of IBT members or leadership to cooperate fully with the IRB. *Compromise Agreements,* 842 F.Supp. at 1551–52; *see* Consent Decree ¶ G(a).

(Letter from Dan K. Webb, Esq., to John J. Cronin, Jr., Administrator, Independent Review Board, at 1–2 (Oct. 7, 1994).) The hearing was rescheduled for December 20, 21, and 22, 1994 in Chicago, Illinois. Simpson then "request[ed] that the IRB cause to be issued a subpoena *ad testificatum* to Mr. Leroy Ellis ("Ellis") requiring him to be present for cross-examination at the hearing in this case...." (Letter from Peter C. McCabe III, Esq., to John J. Cronin, Jr., Administrator, Independent Review Board, at 1–2 (Nov. 14, 1994) (requesting that this Court issue subpoenas to Leroy Ellis requiring him to be present at Simpson's hearing).) In a Memorandum and Order dated December 15, 1994, this Court denied the request that this Court issue subpoenas. December 15, 1994, Memorandum & Order [Simpson Subpoenas], 870 F.Supp. 557 (S.D.N.Y.1994).

On December 20 and 21, 1994, the IRB held the hearing on the charges against Simpson. At this hearing, the IRB heard from Celia Zahner ("Zahner"), counsel to Chief Investigator Charles Carberry ("the Chief Investigator" or "Carberry") of the IRB. (In re: Robert Simpson, Transcript ("Tr."), at 12 (Dec. 20, 1994).) Zahner offered into evidence three volumes of exhibits as evidence of the charges against Simpson. *Id.; see* (Investigative Officers' Exhibits, In re: Robert Simpson, Local 743 ("I.O.Ex.") Vols. I–III.) Zahner categorized the exhibits, and she briefly explained to the IRB the information that the exhibits contain. (Tr. 18–29.) Zahner offered no other evidence or testimony at the hearing.

The exhibits that Zahner provided the IRB set forth both the background and the substance of the charges against Simpson. (Opinion and Decision of the Independent Review Board, In re: Robert Simpson, IBT Local 743 ("IRB Opinion and Decision"), at 2 (July 30, 1995).) Donald Peters ("Peters"), the former President of Local 743 and a former International Vice President, was a named defendant in the civil RICO case *United States v. International Brotherhood of Teamsters,* 88 Civ. 4486 (DNE) ("the civil RICO case"). *Id.* at 3. On March 14, 1989, the eve of trial in the civil RICO case, Peters entered into a voluntary, court-approved settlement agreement with the Government ("Peters's consent decree"). *Id.* at 8; *see* (I.O.Ex. 11.) Under the terms of Peters's consent decree, Peters agreed to resign permanently from all his IBT International positions effective immediately, "permanently retire from all positions as an officer, agent, representative or employee of the IBT or any IBT subordinate body by June 1, 1989," and "to permanently retire from all positions as a trustee, agent, representative or employee of any IBT-affiliated employee benefit fund no later than September 30, 1989." (IRB Opinion and Decision at 8–9); (I.O. Ex. 11.)

The IRB's Opinion and Decision determined that despite the terms of Peters's settlement agreement, Peters continued to have an active role in the affairs of Local 743. Pursuant to a resolution passed by the Local 743 Executive Board, Peters maintained an office at Local 743, attended Local 743 meetings, was paid "for consulting work while traveling and representing the interest[s] of Local 743 and its members," and continued to travel to various IBT functions including the 1991 IBT Convention in Orlando, Florida, (IRB Opinion and Decision at 22); (I.O. Ex. 54–55), and the 1993 Central Conference of Teamsters Convention in Las Vegas, Nevada. (IRB Opinion and Decision at 23); (I.O. Ex. 45 at 19–25.) In addition, Peters joined Simpson in attending meetings pertaining to union business for which Local 743 paid Peters's expenses. (I.O. Ex. 6 at 43.)

The IRB found that although Local 743's Bylaws require investigation into allegations of wrongdoing by an officer of the Local, (I.O.Ex. 13), Simpson failed to investigate Peters during the period from June 28, 1988, when Peters was named as a defendant in the civil RICO case, to May 31, 1989, when Peters permanently resigned from the Local pursuant to his settlement agreement with the United States. (IRB Opinion and Decision at 5.) Moreover, Simpson facilitated Peters's continued prohibited involvement with the Local and the IBT in contravention of the terms of Peters's consent decree from the time that Peters agreed to resign permanently from the IBT until approximately early 1993. *Id.* By allowing Peters to maintain

an ongoing relationship as a representative of Local 743, to incur expenses that were paid by Local 743, and to attend IBT functions, Simpson ignored the prohibition against Peters's acting as an IBT representative, thereby violating Article II, Section 2(a) and Article XIX, Section 7(b)(1) and (5) of the IBT Constitution.[2] *Id.* at 5–6.

In response to the evidence offered by Zahner, Simpson and his attorneys presented their case to the IRB. First, Simpson took the stand. Simpson testified about his background, his family, and his first contact with Local 743. (Tr. 48–52.) He testified that he joined Local 743 in 1954, *id.* at 52, that he became a trustee of the Local's executive board in 1963, *id.* at 53, that he became President in 1988, *id.* at 54, and that he has known Peters since 1953. *Id.* at 58. Simpson stated that he never believed that Peters was a member of, or affiliated with, organized crime. *Id.* at 62–63.

Simpson then testified about the various events and accusations that comprise the IRB's charges against him. Simpson first explained that on February 19, 1988, before Peters was named a defendant in the civil RICO suit, Simpson and the other members of the Local 743 Executive Board unanimously passed a resolution regarding Peters that the Local membership later approved ("February 1988 Resolution"). *Id.* 64, 70. The February 1988 Resolution designated Peters as President Emeritus of Local 743 for life, *id.* at 71, allowed Peters to act as an advisor and consultant for the Local, *id.* at 71–77, permitted Peters to be reimbursed by the Local for expenses he incurred in the course of consulting for and advising Local 743, *id.* at 73, and provided Peters with an office in Local 743's offices from which to carry on this work. *Id.* at 73–74. Simpson testified that the purpose of this resolution was to honor Peters for "his many years of faithful service to the local," *id.* at 67, 71, and to

retain Peters's services for the purpose of negotiating oral agreements and contracts with employers in the future. *Id.* at 65–66. Throughout his testimony, Simpson indicated that he relied on Marvin Gittler ("Gittler"), Local 743's General Counsel, for approval of this resolution, *id.* at 67–80, 88, and for advice regarding the impact of Peters's consent decree on Peters's continued relationship with the Local. *Id.* at 190–91.

Simpson stated that Peters received a salary from Local 743 under the terms of the February 1988 Resolution. Peters's salary as President of Local 743 had been $200,00 per year; when Peters stepped down as President, he became a Trustee of the Local and drew a salary of $100,000 per year for that position. *Id.* at 75, 77. Peters continued to receive this salary until he resigned from the IBT in March or April of 1989. *Id.* at 77.

Simpson repeatedly testified that he did not see anything wrong with the arrangements that the February 1988 Resolution provided for Peters, *id.* at 71, 73, 80, and he stated that he thought the resolution served Local 743's best interests. *Id.* at 81. In addition, when asked whether "[at] the time that [the February 1988] resolution was passed, as the new president of the union, did [he] have any idea that several months later the Department of Justice would actually name Don Peters as a defendant in the civil RICO case?" Simpson replied "No, I didn't." *Id.* at 80. Simpson then indicated that although he eventually did learn of the civil RICO suit and about Peters's status as a defendant in that suit, Simpson did not know when or how he learned these facts. *Id.* at 83.

Regarding Peters's settlement of the civil RICO case, Simpson testified that he was aware that Peters resolved the charges against Peters through a consent decree, *id.* at 83, that Gittler, as Peters's attorney,

---

**2.** Article II, section 2(a) of the IBT Constitution requires every IBT member to "conduct himself . . . in a manner so as not to bring reproach upon the Union." IBT Const., Art. II, § 2(a).

Article XIX, section 7(b) is a non-exhaustive list of disciplinary charges that may be filed against IBT members. The two specific Section 7(b) charges brought against Simpson are: (1) violat-

ing a specific provision of the IBT Constitution, Local Union Bylaws, or other Union rules; and (2) engaging in "conduct which is disruptive of, interferes with, or induces others to disrupt or interfere with, the performance of any union's legal or contractual obligations." *Id.,* Art. XIX, §§ 7(b)(1), (5).

signed the consent decree on behalf of Peters, *id.* at 84, and that the consent decree ordered Peters to resign from all of his Teamster positions as part of his settlement with the Government. *Id.* at 85–86. Simpson also asserted that Peters's consent decree did not bar Peters from having any contact with Teamster officials, and that Simpson was aware that other individual consent decrees arising out of the civil RICO case had barred other defendants in the civil RICO case from having such contact. *Id.* at 86–87.

Simpson testified that Peters's consent decree raised a question in Simpson's mind whether there was any conflict between Peters's consent decree and the February 1988 Resolution, and that he consulted Gittler in order to resolve this question. *Id.* at 88. Simpson recalled that Gittler informed Simpson by letter that there was no conflict between the two documents. *Id.* at 88–92. When asked if he took the letter from Gittler "as full authorization from a lawyer that you could go forward and have contact with Don Peters," Simpson replied "Yes, I did...." *Id.* at 95.

Simpson also claimed that during the period of time in question, he neither held out Peters as a representative of the Local, *id.* at 96, 103, nor believed that he was holding out Peters as an agent or representative of Local 743. *Id.* at 95–96. He further asserted his belief that using Peters as a consultant for Local 743 business did not violate Peters's consent decree. *Id.* at 97. He admitted that the "main consent decree" bound IBT locals, but stated that he believed that Peters's consent decree did not bind his local. *Id.* at 105. Simpson also indicated that after Peters entered into his consent decree with the Government, Peters continued to have contact not only with Local 743, but also with the IBT International, *id.* at 97–98, as well as with Simpson himself. *Id.* at 109. Simpson stated that he did not believe that any of these contacts was wrong. *Id.* at 103.

Simpson also discussed Peters's appearances at and addresses to two labor rallies in 1990 and 1991. He stated that the first rally, held at Teamster City Union Hall in Chicago on January 20, 1990, was "recommended" by PUSH, a community-based African–American organization, and was run by PUSH and one of Simpson's business agents. *Id.* at 113–14. Simpson admitted that Peters spoke at the rally, but denied that Simpson was responsible for Peters's actions. Simpson asserted that the master of ceremonies of the rally, a local media personality who did not work for the Local, "spontaneously" called Peters out of the audience to speak. *Id.* at 115–16. Simpson further claimed that Peters neither was introduced nor spoke as a current representative of Local 743 at the rally. *Id.* at 118.

The second rally was a shop stewards' meeting held on September 14, 1991, at Teamster City. *Id.* at 119–20. Simpson testified that he organized this meeting in conjunction with the IBT International, *id.* at 120–21, and that the IBT International representatives suggested that Peters give a brief talk on the history of the Union. *Id.* at 122. Simpson stated that he concurred with this suggestion, invited Peters to the meeting, and clearly introduced Peters "as the former president" of the Local, not as a current representative or agent of Local 743. *Id.* at 123–24. According to Simpson, Peters spoke only about the history of the Union, and this speech lasted only about five minutes. *Id.* at 123.

Simpson next discussed the IRB's allegation that Simpson "approved a resolution authorizing Local 743 to pay Peters's expenses while [Peters] traveled." *Id.* at 126–27. Simpson stated that, as he recalled, the travel for which Peters was to be reimbursed "occurred prior to 1991," *id.* at 127, and included trips to Hilton Head for an Eastern Conference of Teamsters meeting, St. Louis for a Central Conference of Teamsters meeting, and Florida for an unspecified conference. *Id.* at 127–28. Simpson explained that he viewed reimbursing Peters for Peters's travel with Local 743 funds as "an investment," and "a service to the union," because Simpson intended to run for IBT International office in 1990 and Peters's presence at these events would assist Simpson in Simpson's campaign for International office. *Id.* at 129–30.

Simpson then discussed the IRB's allegation that Simpson "allowed 743 to pay the expenses in connection with the meetings attended by [Simpson], Peters, and others, where union business was discussed." *Id.* at 130. When asked by his attorney if he "actually attend[ed] certain luncheon and dinner meetings where Don Peters and others were present in which union business was discussed," Simpson replied, "Yes." *Id.* Simpson further stated that, at each of these meetings, he tried to seek advice from Peters on various matters. *Id.* at 131. He claimed that he sought such advice pursuant to the February 1988 Resolution and Gittler's letter advising him that there was no conflict between the February 1988 Resolution and Peters's consent decree. *Id.* Simpson maintained that it was necessary for him to seek advice from Peters because during Peters's long history with the IBT, Peters had developed "specialized knowledge" about Local 743 issues, such as the most effective negotiating techniques to use with specific employers, and the customary practice for handling bills from the Local's accounting company. *Id.* at 133, 138.

Finally, Simpson testified about the IRB's charge that Simpson "permitted Local 743 to pay for Peters's hotel expenses at the 1991 IBT Convention in Orlando, Florida," as well as Peters's trip to the 1993 Central Conference of Teamsters' Convention in Las Vegas, Nevada ("Central Conference Convention"). *Id.* at 141. Simpson stated that Peters was invited to the 1991 Convention as a guest of Local 743 because "as a past practice, we had always invited many of our retired officers or our retired business agents to also go down as guests of the local union. . . ." *Id.* at 143. He further indicated that Peters never represented himself as a current agent or representative of Local 743 during the convention, *id.* at 144, and that Peters never did anything during the convention that Simpson thought violated the IBT Consent Decree. *Id.* at 145. Regarding the Central Conference Convention in Las Vegas, Simpson testified that he neither knew in advance that Peters would be in attendance at the convention nor could recall how Peters came to be present at the convention. *Id.* at 146–48. Simpson also was unable to remember what Peters did at

the convention, but Simpson stated that he did not think that there was anything in Peters's consent decree that would have barred Peters from attending such a convention. *Id.* at 148–49.

Prior to completing his direct examination, Simpson testified about a conversation he had with Gittler in January 1993, regarding Gittler's presence at a hearing involving parties from another IBT local in Chicago. Simpson recalled that Gittler told Simpson that the parties involved in that hearing alleged that Peters was associated with members of organized crime. *Id.* at 150. Simpson testified that he did not personally know certain individuals alleged to be members of organized crime, and he was not aware of any "Mob figures" among his acquaintances. *Id.* at 151. He admitted, however, that he knew Dominick Senese ("Senese") because Senese ran another union in Chicago. *Id.* Simpson testified that in response to Gittler's information regarding Peters's alleged association with members of organized crime, Simpson thought that he should investigate this matter and asked Gittler to initiate an investigation. *Id.* at 153. Simpson stated that he chose Gittler to investigate because "the work load was such that no one had the time or had the skills, either, to do it." *Id.* at 152–53. Simpson testified that he and Gittler then had a conversation about what to do regarding Peters and Peters's alleged ties to organized crime. *Id.* at 153. According to Simpson, Gittler told Simpson that "it just doesn't look like this is going to go away, and you've got to make some decisions." *Id.*

Simpson explained that, following his conversation with Gittler, Simpson had a meeting with Peters regarding the allegations that Peters had ties to organized crime. *Id.* at 154. According to Simpson, as a result of this conversation, Peters wrote a letter to Local 743's Executive Board in which Peters severed all contacts and relations with Local 743 and its retiree club, resigned from all Local 743 offices, and relinquished his designation as President Emeritus of the Local. *Id.* at 154–55. Simpson indicated that, after the receipt of Peters's letter, Peters was denied access to his Local 743 office. *Id.* at

155. Simpson testified that he could not remember whether Peters's name was removed from the Local 743 stationery. *Id.* at 155. Simpson concluded this portion of his testimony by stating that he did not think it was fair to either the Local or to Peters that Peters was forced to abandon his contacts with the Local, and that Simpson never had any reason to believe that Peters was connected with organized crime. *Id.* at 155–58. Simpson continued, however, that he accepted Peters's departure from the Local because of Gittler's opinion that the issue of Peters's affiliation with organized crime was never "going to go away." *Id.* at 155–58.

On cross-examination, the Chief Investigator's office elicited testimony from Simpson regarding certain points that Simpson covered during his direct examination. First, Simpson acknowledged that he was aware of a Local 743 bylaw that imposed upon members of Local 743's Executive Board a duty to investigate allegations that a Local officer had breached his fiduciary duties to the Local. *Id.* at 184. Second, he admitted to reading the civil RICO complaint at approximately the time it was filed, and to noting that Peters was a named defendant in that case. *Id.* at 185–86. Third, he admitted that he had asked Peters about at least two of the allegations against Peters in the civil RICO complaint at the time the complaint was filed, even though he previously testified that he had never asked Peters about any of the allegations in the civil RICO complaint. *Id.* at 186. In addition, Simpson testified that, although he asked Peters about some of the allegations against Peters in the civil RICO complaint, he never asked Peters to produce any of the evidence that the Government had produced against Peters. *Id.* at 187, 189.

Simpson also responded to questions about Gittler on cross-examination. He indicated that he never asked Gittler to summarize the evidence that the Government had produced against Peters. *Id.* at 189. He also testified that he knew that Gittler's firm represented Peters in connection with the civil RICO suit, and that Peters's legal fees were paid by the International, but Simpson claimed that he was unsure whether Gittler was representing Peters. *Id.* at 189. Simpson indicated, how-ever, that he did not think that any conflict of interest existed between Gittler's representation of Peters and Gittler's service as Local 743's General Counsel. Simpson stated that he relied on Gittler, *id.* at 230, and believed that if Gittler thought that a conflict of interest existed, that Gittler would have informed Simpson. *Id.* at 190–93, 231–32.

During cross-examination, Simpson also discussed various Local 743 business meetings that both he and Peters attended after Peters resigned from the Local. *Id.* at 209–21. Simpson reiterated that many of the agreements and contracts that Local 743 made with employers were oral in nature, and that Peters had negotiated these oral agreements prior to the time Peters left the Local. *Id.* at 219–20. In response to a question from the IRB, Simpson admitted that he never asked Peters to commit any of these agreements to writing, even after Peters left the Local. *Id.* at 220–21.

Following his own testimony, Simpson called as a witness Mr. Marvin Gittler, the General Counsel of Local 743. Gittler stated that he began representing Local 743 in 1967, and that he has provided legal services to the Local continuously since that time. *Id.* at 238. He then testified at length about the February 1988 Resolution. Gittler told the IRB that in late 1987, he was advised that Peters was going to retire and understood "that a transition was going to be necessary." *Id.* at 241–42. In light of these facts, Gittler stated that he drafted the February 1988 Resolution "which would give the Local Union, the Executive Board, the authority to deal with and consult with Mr. Peters for the future." *Id.* at 242. He testified that Peters's designation as President Emeritus was an honorary title, *id.* at 243, and that the purpose of authorizing Peters to act as an advisor and consultant to the Local following his retirement was "[s]o that there would be full disclosure of the fact that the Executive Board may be calling upon him to obtain whatever knowledge he had to assist them in the future." *Id.* at 244. Gittler stated that, in his view, it would be in the best interest of the Local to be able to have contact with Peters after Peters retired. *Id.* at 244–45. He further indicated that he be-

lieved that the February 1988 Resolution was a proper legal resolution, that it is the type of resolution commonly drafted and passed by IBT locals, and that providing Peters with an office at Local 743 was normal and proper. *Id.* at 245–47.

Gittler then spoke about Peters's involvement in the civil RICO suit against the IBT. He explained that he represented Peters as a defendant in this suit, *id.* at 251, that he reviewed the allegations against Peters, and determined that there was no conflict of interest preventing Gittler from representing Peters in this suit. *Id.* at 252–53. He also stated that he "made it clear to Mr. Peters that responsibility for [the] bill for services would be his," and that Peters asked Gittler "to be kind" in his billing of Peters. *Id.* at 253. Gittler then discussed the discovery that followed the filing of the civil RICO complaint. He recounted that Peters was required to give a deposition, but that it was never completed. *Id.* at 254–55.

Gittler continued his testimony, focusing on the court-approved settlement of the charges against Peters. He testified that on the eve of trial in the civil RICO case, the parties resolved the case, and Peters approved of this resolution. *Id.* at 259–60. Gittler then recounted a conversation that he had with one of the Government's attorneys in the civil RICO case during which Gittler told the Government attorney that Peters would approve the consent decree, and that Peters wanted to "retire honorably." *Id.* at 260. According to Gittler, the Government had no objection to Peters's request, and Peters and the Government then entered into a consent decree that set forth the terms of Peters's "retirement." *Id.* at 261–63. Gittler went on to testify about other individual consent decrees that arose from the settlement of the civil RICO case. He reviewed examples of such settlements and testified that some of them "barred some of the civil defendants from having any contact with Teamster representatives." *Id.* at 266.

Gittler then indicated that, at some point, Simpson became aware of the terms of Peters's consent decree and asked Gittler whether there was any conflict between Peters's consent decree and the February 1988 Resolution. *Id.* at 266–67. Gittler testified that he reviewed both Peters's consent decree and the February 1988 Resolution and "was fairly well satisfied in my mind that there was no inconsistency between the two, and expressed that to Mr. Simpson." *Id.* at 267. Gittler then stated that he advised Simpson of this position and that Gittler "saw no prohibition" against "Peters's association with the Local." *Id.* at 268. Gittler testified that he then reduced this opinion to writing in a letter addressed to Simpson and the Local 743 Executive Board. *Id.*

Gittler next testified about his legal work for Local 743. He represented that, at the time that Simpson consulted him on the above-mentioned matter, Gittler was the General Counsel for Local 743. *Id.* at 269. He stated that his representation of Peters in the civil RICO case was the first time that he had represented Peters individually. *Id.* at 269. He proceeded to explain the details of Peters's consent decree. Gittler testified that although Peters's consent decree required Peters permanently to retire from the IBT, Gittler believed "that at most the commitment to the consent decree meant that Mr. Peters could not be on the payroll, could not earn a salary or derive an income from the Local or any affiliate." *Id.* at 274. Gittler also acknowledged that Peters's consent decree did not explicitly prohibit Peters from holding a paid IBT position in the future, but that because the decree spoke of Peters "permanently" retiring from the IBT, Gittler interpreted the decree as prohibiting Peters from ever holding a paid position. *Id.* at 275. Gittler stated that he expressed this view to Simpson. *Id.* at 275–76.

Gittler then addressed the issue of why he thought Peters's consent decree, which stated that Peters had to retire permanently from all positions in the IBT, was not inconsistent with the February 1988 Resolution. When asked to explain why he did not think the two documents were inconsistent, Gittler answered that there were "no findings relating to Mr. Peters, no conclusions" in the decree, and that there was "a specific non-admissions clause in the decree." *Id.* at 276. Gittler also asserted that Peters's consent decree only barred Peters from holding the

positions of "business agent" or "business representative" in the union, that these terms were terms of art within the labor field that referred to specific labor positions, and that consequently, Peters's consent decree only prohibited Peters from holding either of these specific positions, not from holding any other positions. *Id.* at 277. Accordingly, Gittler stated that his legal opinion was that Simpson could consult with and have contacts with Peters. *Id.* at 278.

Gittler then discussed Peters's continued involvement in Local 743 affairs. Gittler admitted that he was aware that during the three years following the signing of Peters's consent decree Simpson had contact with Peters and used Peters as a consultant under the terms of the February 1988 Resolution. *Id.* at 279–80. He acknowledged that Peters's contacts with Simpson related to issues about which Peters had historical knowledge and that would be helpful to the Local, that the Local paid for certain meal expenses in connection with this work, and that Simpson was following Gittler's advice when Simpson conducted this business with Peters. *Id.* at 280. Gittler further professed that without Peters's continued consultations with the Local, "Simpson could have made strategic mistakes that might have affected the rights of employees under contracts or enforcing those rights," and that Peters's involvement in the affairs of the Local benefitted the Local. *Id.* at 280.

Gittler then testified about the impact that the various consent decrees had on Local 743. He claimed that Local 743 was not a party to Peters's consent decree and, consequently, was not bound by the terms of Peters's consent decree. *Id.* at 282. He also stated that he was aware that some locals are bound by the Consent Decree that settled the Government's civil RICO suit against the IBT, even though those locals were not parties to the original suit. *Id.* at 283. He then indicated that he was unaware of any Second Circuit opinion that has bound a local, like Local 743, to a consent decree entered by an individual. *Id.* at 284.

Gittler next discussed his involvement in a December 1992 administrative hearing concerning members of another labor union, IBT Local 738. *Id.* at 284–301. During the course of this representation, Gittler read the affidavit of an FBI agent who stated that Peters was a Chicago LCN associate, and that Peters resigned from Local 743 to settle civil RICO charges filed against him. *Id.* at 286. Gittler told the IRB that he was "taken aback" and "surprised" by the FBI agent's allegation, and that prior to reading the agent's affidavit, Gittler had neither known nor believed that Peters was associated with La Cosa Nostra. *Id.* at 287. Gittler stated that because he was General Counsel to Local 743, he felt he had an obligation to bring this allegation to Simpson's attention, and that he did bring it to Simpson's attention. *Id.* at 288–89. Gittler testified that after he and Simpson discussed the allegation regarding Peters, Simpson told Gittler to investigate the matter and that Gittler investigated it. *Id.* at 291. Gittler stated that this investigation yielded no evidence that supported the FBI agent's allegation. *Id.* at 293–301.

Gittler also stated that at some moment in time, a second affidavit by the same FBI agent surfaced, and that it contained more references to Peters's contacts with organized crime. *Id.* at 301–02. Gittler testified that this affidavit led him to conclude that he, once again, had to advise Simpson of this matter, and "that whatever relationship may have existed, whatever benefits Mr. Peters was still receiving, whatever communications Mr. Simpson may have had with Mr. Peters [should] stop, be severed and ended." *Id.* at 304–05. Gittler testified that Simpson accepted this recommendation. *Id.* at 307. Gittler explained that he met with Peters and discussed this matter with him, and that Peters consented to separating himself from the Local by writing a letter to the Executive Board of Local 743 stating that Peters would terminate and sever all relationships with Local 743. *Id.* at 308–10.

On cross-examination, the Chief Investigator's office revisited several topics about which Gittler testified on direct examination. Gittler discussed his representation of Peters and testified that Gittler's bill of $150,000 for representing Peters was paid by the International. *Id.* at 315–16. Gittler further admitted that while he was representing Peters,

Gittler had access to all the discovery material in the civil RICO suit, including a computer data base from which individuals could retrieve information by entering search requests, *id.* at 317–18, material generated by the New York law firm of Mudge, Rose, Guthrie and Alexander, *id.* at 320–21, and wiretaps. *Id.* at 323. Gittler testified that despite having access to these sources of information about Peters, Gittler never reviewed them during the investigation of Peters that he conducted at Simpson's request. *Id.* at 318, 321, 323–24.

Gittler also discussed his understanding of the Consent Decree. He stated that although he was aware that the Consent Decree forbids IBT members from knowingly associating with members of organized crime, he believed that such association had to be for "illegal purposes" in order to fall within the terms of the Consent Decree. *Id.* at 325. Gittler then admitted that he was familiar with case law generated by the Consent Decree holding that a lack of illegal purpose is no defense to a charge of knowingly associating with members of organized crime in violation of the Consent Decree. *Id.* at 325–26.

In addition, Carberry asked Gittler several specific questions regarding Gittler's conduct. Carberry asked whether if Gittler had reviewed all the discovery material available to him, Gittler could have discovered evidence to support the FBI allegations that Peters knowingly associated with members of organized crime. *Id.* at 326–29. Although Gittler's response to this inquiry was evasive, Gittler conceded that if he had reviewed the discovery material available to him, the evidence contained in the material would have raised doubts in his mind about whether Peters knowingly associated with members of organized crime. *Id.* at 329. In addition, Carberry asked if Peters violated the terms of his individual consent decree, would Peters have been in contempt of court? *Id.* at 331. Carberry also asked whether anyone who knowingly assisted Peters in violating that agreement would have been in contempt of court? *Id.* at 332. Gittler replied affirmatively to both of these questions. *Id.* at 331–32. Gittler's testimony concluded the first day of the hearing.

On the second day of the hearing, Simpson called ten witnesses to testify on his behalf. These witnesses range in their professions and their respective relationships with Simpson from Eugene Sawyer, former Mayor of Chicago, *id.* at 407–10, and Roland Burris, the Attorney General for the State of Illinois, *id.* at 454–58, to Dennis F. Glass, an investment manager who runs the Local 743 Health and Welfare Fund, *id.* at 354–64, Louis Montenegro, the retired Vice President and Regional Director of the Ladies Garment Workers' Union, *id.* at 410–437, and Dick Scheidt, an employee of Montgomery Ward. *Id.* at 444–54. Each witness testified regarding his relationship with Simpson and his opinion of Simpson's character and reputation. In addition, several witnesses testified about specific instances in which they have observed Simpson's work as an IBT Local and International official, *see, e.g., id.* at 358–63 (testimony of Dennis F. Glass), 371–76 (testimony of Thomas J. Walter), 420–36 (testimony of Louis Montenegro), or Peters's continued involvement in Local 743 affairs. *See, e.g., id.* at 418–22 (testimony of Louis Montenegro), 449–52 (testimony of Dick Scheidt).

Following the live testimony, Simpson's attorneys offered three volumes of exhibits into evidence, *id.* at 476, then addressed the IRB directly on Simpson's behalf. *Id.* at 486–500. In addition, because the hearing lasted only two days, instead of the three that originally were scheduled, IRB Member Frederick B. Lacey ("Lacey") addressed the hearing participants because he wanted "to make sure ... that nobody had felt under any pressure to curtail these proceedings." *Id.* at 486. Simpson's attorney responded to Lacey's inquiry as follows:

> We felt no pressure. We understand the procedure and the mechanisms of conducting these hearings.

> And we chose not to submit every witness live knowing that the Review Board will review all of the evidence we submit, and we are not suggesting nor do we feel that we've been curtailed in any way whatsoever.

We've been treated fairly, and we've had an opportunity to present our evidence. *Id.* at 487.

At the conclusion of the hearing, the IRB imposed a post-hearing schedule on the hearing participants. The IRB informed the participants that within fourteen days after the receipt of the hearing transcript, Carberry would be required to deliver his post-hearing memorandum to the IRB, the IBT, and Simpson. *Id.* at 502. Within ten days of receiving the Carberry's memorandum, Simpson was required to serve an answering memorandum on the IRB and Carberry. *Id.* In addition, within five days after receiving the answering memorandum, the Carberry would be required to deliver his reply memorandum to the IRB, the IBT, and Simpson. *Id.*

Based on the evidence produced at the hearing, the IRB held that it had been established by a preponderance of the evidence, *see* (IRB Rules, ¶ J.6), that "Simpson brought reproach upon the IBT and interfered with the Local's legal obligations by allowing Peters to act as a representative and agent of the Local and its Funds in violation of the Peters's court-approved settlement agreement." (Application XXI of the Independent Review Board—Opinion of the Independent Review Board in the Matter of Robert J. Simpson ("Application XXI Opinion") 2 (July 25, 1995)); (IRB Opinion and Decision at 29.) In reaching this conclusion, the IRB made several specific findings regarding Simpson's conduct during the period of time spanning from Local 743's adoption of the February 1988 Resolution to Peters's final resignation from the IBT in 1993.

The IRB found that Simpson facilitated Peters's continued involvement with the Local and the IBT despite Peters's involvement in the civil RICO suit. Based on the minutes of Local 743 Executive Board meetings and on media coverage of the Government's plans to file a civil RICO suit against the IBT, the IRB concluded that Peters and Simpson were aware that the Government might file a federal civil RICO suit against the IBT as early as August 1987, and that they brought the February 1988 Resolution to the Local 743 Executive Board and membership de-

spite this awareness. (IRB Opinion and Decision at 3, 5); (I.O.Ex. 34, 37.) The IRB further found that for almost a year after the Government filed the complaint in the civil RICO suit, Simpson did nothing to halt the annual salary that Peters drew from the Local. *Id.* at 6. Moreover, despite Simpson's admission that Local 743 Bylaws required him to investigate allegations of wrongdoing by Local officers, Simpson did nothing to investigate the charges against Peters for almost one year following the filing of the civil RICO complaint. *Id.* at 7. During this year, Simpson neither asked Peters, Gittler, or Gittler's law firm whether the case against Peters was a cause for concern nor requested from these sources any evidence relating to the Government's charges against Peters. *Id.* Simpson's actions, as well as his inaction, prompted the IRB to opine that "[f]or Simpson, it was as if the case [against Peters] did not exist." *Id.* In addition, Simpson's continued contact with Peters after Gittler advised Simpson in December 1992, that the FBI considered Peters to be associated with members of organized crime "was additional evidence of Simpson's willingness to facilitate Peters's continued prohibited involvement in union business." *Id.* at 28.

The IRB also made a finding regarding Simpson's reliance on Gittler for advice about the impact of the civil RICO case and Peters's consent decree upon Peters's continued relationship with Local 743. Based on Simpson's testimony that he knew that Gittler's law firm represented Peters in the civil RICO case and that the firm's obligations were to serve Peters's interests in that case, the IRB found that "Simpson did not fulfill his responsibilities as Local 743's principal officer [by] failing to obtain advice from independent counsel whose advice would not be colored by a concern for Peters' interests." *Id.* at 10.

The IRB also repudiated Simpson's explanations and justifications for allowing Peters to remain "extensively involved in the affairs of the union" after Peters's retirement from Local 743 on May 31, 1989. *Id.* at 12. The IRB rejected as a "strained explanation" Simpson's claim that he had to permit Peters

to consult with and advise the Local on certain contracts because Peters had knowledge without which the Local could not effectively represent its members. *Id.* at 13; *see also id.* at 17.

The IRB further found that "contrary to Simpson's contention, Peters did not simply function as a passive informational resource to Local officials or lawyers," but "actually acted as Local representative in dealing with non-Teamster unions." *Id.* at 13–14. The IRB based this finding on the lunch and dinner meetings that Peters attended to conduct Local 743 contract negotiations and other business, the oral contracts that he alone negotiated for the Local, his numerous contacts with employee labor organizations outside Local 743 and the IBT, and on the acknowledgement of Local 743's Executive Board that Peters continued to represent the Local after his forced resignation, as reflected in the minutes of the April 1, 1991, Executive Board meeting. *Id.* at 13–18. The events upon which the IRB based this specific finding occurred after October 1, 1989. *See, e.g., id.* at 14 (citing hearing testimony regarding a meeting Simpson and Peters attended in 1991 (Tr. at 198), and the Las Vegas Conference that occurred in 1993 (Tr. at 201)).

Moreover, the IRB found that Simpson's explanation of the activities that Peters conducted on behalf of the Local were "a startling confession that Simpson was using Peters's existing goodwill within the IBT structure beyond the confines of Local 743 to advance *Simpson's* political career in the IBT." *Id.* at 18. Simpson testified that reimbursing Peters for travel to various IBT conventions from Local 743 funds was in the interest of the Local because Peters's presence at these functions assisted Simpson's campaign for IBT International office. *Id.* at 129. According to the IRB, "the use of local union funds to promote a political career of a local officer is an independent violation of the [Labor Management Reporting and Disclosure Act] § 401(g)." *Id.* at 18. The IRB found that Simpson's testimony that Local 743 funds were put to such use was an admission that Simpson "actively facilitated, approved and benefitted

from Peters'[s] representation of the Local and [that] the Executive Board clearly believed that it was paying Peters for advancing the Local['s] interests, consistent with the evidence that [Peters] was acting as a representative of the Local." *Id.* at 19.

The IRB also concluded that Peters's continuing involvement in Local 743 affairs "formed a pattern with Simpson favoring Peters's interests above [Simpson's] obligations to the Local. . . ." *Id.* at 32. The IRB based this conclusion on: (1) Simpson's failure to investigate the charges against Peters after the civil RICO suit was filled, in violation of the Local's Bylaws, *id.;* (2) Simpson's vote to award Peters a car at Local expense, in violation the Local's Bylaws, *id.* at 33; and (3) Simpson's approval of Peters collecting a salary for almost a year after the civil RICO charges were filed. *Id.* at 33. Furthermore, the IRB stated that "[a]llowing Peters to continue to represent the Local by campaigning at Local expense for Simpson's election as an International Trustee demonstrates that Simpson also favored his interests over the Local." *Id.* The IRB characterized Simpson's actions as a "pattern of Simpson facilitating and condoning Peters's prohibited involvement in the ongoing business of Local 743. . . ." *Id.* Because "a pattern of conduct [can] constitute[ ] a violation of the IBT Constitution, even if no single element of the pattern is itself a violation," the IRB found that Simpson's actions brought reproach on the IBT and interfered with the Local's legal obligations. *Id.*

The final finding that the IRB made regarding the charges that Simpson allowed Peters to continue to represent the Local concerned the benefit funds administered on behalf of Local 743 members. Simpson was aware that Peters's consent decree permitted Peters to serve as an officer of the Local in order to complete his duties as trustee of the Local's benefit funds for four months after Peters resigned from the Union. (Tr. 182.) The IRB found that Peters continued to serve as a representative of the Local to the Local's benefit funds after his designated resignation date "in the specific areas of investment performance, collections, resolution of claims, and definition of particular

eligibility criteria." *Id.* at 20; *see id.* at 21–26. The IRB went on to explain that Simpson attended some of the meetings at which Peters functioned as a Local representative, *id.* at 22, allowed Peters to remain fully informed and to participate in the activities of the funds, *id.* at 26 n. 25, and made no effort to limit Peters's involvement in the affairs of the benefit funds. *Id.* at 26. Although Simpson proffered various explanations for Peters's presence at benefit fund meetings, the IRB rejected these explanations, *id.* at 26–27, and specifically found that there were other Local 743 Trustees and professionals who were capable of handling the matters in which Peters was involved. *Id.* at 27.

In addition to making findings regarding the charge that Simpson facilitated Peters's continued involvement in Local 743 affairs, the IRB also rejected the defenses that Simpson raised in response to the charges against him. First, the IRB rejected Simpson's claim that because Peters's consent decree does not specifically prohibit Simpson's associating or working with Peters or being assisted by him, Simpson's contacts with Peters were permissible. The IRB not only disagreed with this characterization of Peters's consent decree, *id.* at 27, but also stated that its findings were not based on Simpson's association or work with Peters, but rather were "based on, among other things, Simpson maintaining Peters as a representative of the Local." *Id.* at 28.

Second, the IRB repudiated Simpson's position that under the court-approved agreement, Peters was barred only from the specific union positions of "business agent" or "business representative." *Id.* at 29–30. The IRB stated that Peters's court-approved agreement "set forth a broader prohibition" on Peters's activities and required him to resign from "all positions as an 'agent' or 'representative' of the IBT, any IBT subordinate body and any IBT affiliated benefit fund." *Id.* at 29–30. The IRB indicated that it was familiar with the designations "business agent" and "business representative" as union terms of art, and the IRB opined that "if the drafters of the court-approved settlement agreement intended to restrict the pro-

hibitions on Peters to the positions of 'business agent' and 'business representative', those specific terms would have been used." *Id.* at 30.

Third, the IRB denied Simpson's claims that he was properly entitled to rely on Gittler for advice regarding the effect of Peters's relationship with Local 743. The IRB noted that Simpson, was "an experienced labor negotiator, who was familiar with the potential conflict of interest in an attorney's representation of two clients," and therefore, Simpson "could not have reasonably relied on Gittler's statements concerning Peters's ability to stay involved with the Local because Gittler was Peters' attorney." *Id.* at 30. Consequently, the IRB found that Simpson should have obtained advice from an independent counsel on this matter. *Id.* at 30–31.

Finally, the IRB rejected Simpson's claim that he needed Peters's special knowledge and assistance in order to carry out the affairs of the Local. The IRB noted that although Simpson had opportunity to protect the Local by requiring Peters to memorialize his knowledge of the Local's oral contracts and the Local's history, Simpson never did so. *Id.* at 32. As a result of this failure, the IRB concluded that Simpson "engaged in a pattern of conduct that allowed Peters to act as an agent and representative of Local 743 and its affiliate benefit funds," and that this pattern of conduct not only assisted Peters in violating the settlement agreement, but also brought reproach upon the Union. *Id.* at 31–32.

At the end of its Opinion and Decision the IRB "note[d] the inconsistencies between Simpson's hearing testimony and his prior statements which place his credibility in question." *Id.* at 33. The IRB found further reason to question Simpson's credibility as a result of his "attempt to conceal from the Investigations Office the Local's payments for Peters's attendance at the 1991 IBT Convention," *id.* at 34, and Simpson's attempts to justify the meetings that Peters attended concerning the Local's benefit funds after Peters had resigned from his positions as a trustee of the funds. *Id.* at 35.

The IRB concluded its Opinion and Decision by reiterating its finding that the charges against Simpson had been proved and by stating that "Simpson's conduct makes him unfit to serve in any position of trust or responsibility within the IBT or any of its affiliates." *Id.* at 37. Accordingly, the IRB ordered that Simpson "remove himself as President of Local 743, and draw no money or compensation therefrom." *Id.* The IRB also permanently barred Simpson from holding any position with the IBT or any IBT-affiliated entity in the future, and ruled that Simpson may not hereafter obtain employment, consulting, or other work with the IBT or any IBT-affiliated entity. *Id.* The IRB did not stay either its Opinion and Decision or the penalties it imposed on Simpson pending this Court's review of this matter, finding that it is "in the best interest of the IBT to commence the permanent bar immediately." (Application XXI Opinion at 2.)

This Court received IRB Application XXI consisting of the IRB's Opinion and Decision concerning Simpson together with supporting exhibits on July 26, 1995. By Order dated July 28, 1995, this Court ordered that any objections to IRB Application XXI be filed no later than noon on August 11, 1995, that responses by the Government and by the Investigations Officer be filed no later than noon on August 25, 1995, and that the Order "does not in any respect stay the disciplinary sanctions imposed on Simpson by the IRB," which went into effect On July 24, 1995. July 28, 1995, Order *[In re: Application XXI of the Independent Review Board]*, 88 Civ. 4486 (July 28, 1995). On August 11, 1995, this Court received from Simpson both his objections to Application XXI and a Notice of Motion.

In the objections submitted to this Court, Simpson details the specific portions of the IRB Opinion and Decision that he finds objectionable. First, Simpson provides background information regarding Simpson, Peters, and Simpson's relationship with IBT President Ron Carey. (Respondent Robert T. Simpson's Objections to the IRB's Opinion and Decision ("Simpson's Objections"), at 3–17 (Aug. 11, 1995).) Simpson denies having any affiliation or association with members of organized crime, and claims that neither the Chief Investigator nor the IRB "alleged or presented a single piece of evidence to the contrary." *Id.* at 3–4.

Simpson describes himself as a self-made man who rose from a Montgomery Ward warehouseman to become president of the largest IBT local, and he asserts that he "has spent his entire adult life fighting for the rights of working men and women throughout the country." *Id.* at 4. As evidence of his claimed "impeccable character," Simpson states that he "has undergone and cleared with flying colors two FBI investigations initiated by Judge Lacey in connection with becoming an International Trustee." *Id.* at 4.

Simpson then describes his relationship with IRB President Ron Carey, which he claims is "[e]ssential to this Court's understanding of why the IRB's Opinions and Decision is politically-motivated...." *Id.* at 5. Simpson claims that, prior to August 3, 1993, Simpson and Carey "were the best of friends." *Id.* In June 1993, however, Simpson and other Trustees performed an audit of the IBT's finances, and they noticed some discrepancies. *Id.* at 6. In August 1993, Simpson and the other Trustees sent Carey a letter concerning these discrepancies. *Id.* In response to this letter, Carey sent Simpson and the other Trustees "a vicious and self-serving letter." *Id.* Subsequently, Carey denied Simpson and the other Trustees access to the Executive Sessions of the 1993 and 1994 General Executive Board Meetings. *Id.* at 6–7. Simpson further asserts that after he sent Carey the August 1993 letter, "Carey has never asked him to serve on any hearing panels," and Carey's contacts with Simpson ceased. *Id.* at 7.

Prior to being charged by the IRB in this instance, according to Simpson, he "had never been accused of wrongdoing in his 41 years of membership in the IBT." *Id.* Simpson alleges that "the proposed charge was brought against him as a result of his questioning Carey's handling of the IBT's finances," and that "the IRB has cast its lot with Carey and appears bent on destroying Carey's political opponents." *Id.*

Simpson also challenges the charges that the Government levelled at Peters. Citing an affidavit provided by Peters, Simpson claims that Peters did not associate with members of organized crime, that Peters was never accused of or charged with being a member of organized crime, and that Peters "has lived his life honorably and with distinction." *Id.* at 8. Simpson asserts that the various allegations against Peters were false and never were proved. *Id.* at 9–11. Simpson also contends that Peters's decision to resign as President of Local 743 had "absolutely nothing to do with the Government's proposed Civil RICO lawsuit against the IBT." *Id.* at 10. In addition, Simpson argues that Peters's involvement in various Local 743 affairs—such as contract negotiations and benefit-claim review—was beneficial to the Local. *Id.* at 12–14.

Simpson also addresses Peters's travel to the 1991 IBT Convention and the 1993 Central Conference Convention. Regarding the 1991 Convention, Simpson claims that Peters received "guest" credentials from the IBT to attend this function, that "it was the long-standing practice of Local 743 to pay the expenses of all former Officers and Trustees," and that Peters actually paid his own travel expenses to and from the convention. *Id.* at 14. Simpson further claims that Peters then left the convention early because of a family death. *Id.* Regarding the 1993 Central Conference Convention, Simpson states only that Peters attended the convention for two reasons—because Peters liked Las Vegas and because Peters wanted to see old friends. *Id.* Simpson further claims that although Peters attended a June 1993 Teamsters meeting in New Orleans, Peters was invited by someone other than Simpson, and in any event, Peters paid his own travel expenses. *Id.*

Simpson then describes Peters's 1991 address to the shop stewards' meeting at Local 743. Simpson states that Peters gave a ten-minute speech regarding the history of Local 743, and that Peters left the meeting following the speech. *Id.* at 15. Simpson also asserts that "[s]ince his retirement, Peters has never considered himself a representative of Local 743," and that Peters "has never

violated any provisions of the Consent Decree which he signed on March 14, 1989." *Id.*

Simpson makes three final points regarding Peters. First, Simpson asserts that Peters has never been charged with being a member of organized crime, that Peters is currently receiving full pension and benefits from the IBT, and that "[c]learly neither the IBT nor the government would have allowed Peters to retain his pension and benefits if he was involved with organized crime." *Id.* at 15. Second, Simpson claims that "over one year after the entry of Peters's Consent Decree, Judge Lacey in his capacity as Independent Administrator, approved expenses for Peters, which he incurred representing the IBT and its General President, after [Peters] resigned pursuant to his Consent Decree." *Id.* at 16. Third, Simpson states that the IBT paid Peters's legal fees of $179,000, which Peters incurred defending the lawsuit which led to his consent decree. *Id.* Simpson maintains that Peters never would have received payment for these expenses and benefits if Peters had been associated with organized crime. *Id.*

Following this background information, Simpson raises seven specific objections to the IRB's Opinion and Decision: (1) the IRB Opinion and Decision violates federal law because it is based in part on new charges and alleged new evidence that Simpson was neither charged with nor given an opportunity to respond to, *id.* at 17; (2) the IRB "arbitrarily and capriciously concluded that Peters's consent decree was a bar order," *id.* at 24; (3) the IRB Opinion and Decision disregards critical evidence that proves that Simpson is innocent of the IRB's charges, *id.* at 31; (4) the IRB arbitrarily and capriciously disregarded testimony and evidence that refuted the charges against Simpson, and the IRB interpreted the evidence in a manner inconsistent with logic and common sense; *id.* at 43; (5) the IRB Opinion and Decision "was made by a panel bias [sic] against Simpson due to a political dispute between Simpson and Ron Carey," *id.* at 56; (6) the IRB Opinion and Decision violates Simpson's First and Fifth Amendment Rights under the United States Constitution, *id.* at 62; and

(7) "the IRB's punishment of a life time bar from the IBT or any IBT-affiliated entity is unwarranted and totally out of line with similar cases." *Id.* at 69.

As previously mentioned, Simpson also filed motion papers in this Court on August 11, 1995. These papers move this Court "for an Order: (1) denying IRB Application XXI; (2) vacating the IRB Opinion and Decision entered against Simpson; (3) recusing the present members of the IRB from continuing to participate in adjudicating the proposed charges returned against Simpson; and (4) having an impartial and unbiased arbitration panel review the proposed charges lodged against Simpson, and for such other and further relief as the Court deems just and proper." (Notice of Motion, *United States v. International Bhd. of Teamsters*, 88 Cv. 4486 (Aug. 11, 1995) ("August 1995 Motion").) Simpson attached seven exhibits to the August 1995 Motion, *see* (August 1995 Motion, Exhibits A–G.), and submitted memoranda of law. (Memorandum of Law, *United States v. International Bhd. of Teamsters*, 88 Cv. 4486 (Aug. 11, 1995) ("Simpson's Memo")); *see also* (Respondent Robert T. Simpson's Reply Memorandum in Support of Simpson's Motion To Recuse, *United States v. International Bhd. of Teamsters*, 88 Cv. 4486 (Sept. 1, 1995) ("Simpson's Reply Memo").)

On August 25, 1995, this Court received Chief Investigator Carberry's Memorandum of Law in Support of the Independent Review Board's Application XXI, (Chief Investigator's Memorandum of Law in Support of the Independent Review Board's Application XXI (Aug. 25, 1995) ("Memo in Support of IRB Application XXI")), and Chief Investigator Carberry's Memorandum of Law In Opposition to Respondent's Motion To Recuse the Independent Review Board. (Chief Investigator's Memorandum of Law in Opposition to Respondent's Motion To Recuse the Independent Review Board (Aug. 25, 1995) ("Memo Opposing Recusal").) In his Memo in Support of IRB Application XXI, Carberry argues that the IRB's decision should be affirmed in all respects. (Memo in Support of IRB Application XXI at 2.) He reiterates the factual background supporting this argument, *id.* at 2–38, and asserts that the IRB's

decision was not arbitrary and capricious. *Id.* at 39–52. He also contends that the disciplinary proceedings against Simpson did not constitute state action and did comply with all due-process requirements applicable to internal union disciplinary proceedings. *Id.* at 53–59. Carberry claims that Simpson failed to establish an "advice of counsel defense," *id.* at 59–62, and that the sanctions the IRB imposed on Simpson were fully supported by the evidence. *Id.* at 62–64.

In his Memo in Opposition to Recusal, Carberry maintains that Simpson waived any recusal claim Simpson might have raised against the IRB. (Memo in Opposition to Recusal at 2–5.) Alternatively, Carberry asserts that Simpson cites the wrong legal standard in support of his recusal request, *id.* at 6–7, and that, even if the standard Simpson cites in support of the recusal request is appropriate, Simpson failed to provide evidence that satisfies this standard. *Id.* at 8–10. Finally, Carberry claims that recusal of IRB members is unwarranted. *Id.* at 10–11.

On August 25, 1995, this Court also received a letter in support of the IRB Opinion and Decision from the office of the United States Attorney for the Southern District of New York. (Letter from Karen B. Konigsberg, Assistant United States Attorney, to the Honorable David N. Edelstein, United States District Judge for the Southern District of New York ("Konigsberg Letter") (Aug. 25, 1995) (on file with the Clerk of the Court of the Southern District of New York).) The Government argues that Simpson's objections to the IRB Opinion and Decision and his August 1995 Motion "contravene [ ] the well-established principle that the findings of the Independent [Review Board] are entitled to great deference." *Id.* at 1. The Government also raises four arguments in support of the IRB's Opinion and Decision: (1) the IRB's decision imposing disciplinary sanctions on Simpson is supported by the evidence; (2) the actions of the IRB do not constitute state action; (3) Simpson's recusal motion is untimely and fails to meet the appropriate standards to support recusal or a finding of bias; (4) and

the sanctions imposed on Simpson are not arbitrary or capricious.

## DISCUSSION

Before moving to the merits of the instant application, this Court must determine the proper procedure for resolving the various claims that Simpson presents to this Court. With this procedure in clear view, this Court will proceed to examine the merits of Application XXI and the merits of Simpson's objections.

Simpson filed his claims regarding Application XXI in two separate documents—objections and a motion. Although these documents constitute two separate filings, this Court will review the claims contained in both documents together.

 Regardless of the procedural vehicle through which an individual objects to an IRB Opinion and Decision, this Court reviews IRB Opinion and Decisions under the "arbitrary and capricious" standard, pursuant to the Rules and Procedures for Operation of the Independent Review Board. (IRB Rules, ¶ O); *United States v. International Bhd. of Teamsters [Cimino]*, 964 F.2d 1308, 1311 (2d Cir.1992). Although Simpson has raised some of his objections to the IRB Opinion and Decision in a filing styled as a "motion," the standard established by the IRB Rules applies in the instant case. Simpson cannot obtain review of his objections by a different standard merely by raising these objections in a filing styled as a "motion," instead of a filing styled as objections to the IRB Opinion and Decision. Accordingly, all of Simpson's challenges to the IRB Opinion and Decision in Application XXI will be reviewed together, regardless of the procedural vehicle through which Simpson presented these challenges to this Court.

 This Court now turns to the merits of Application XXI and Simpson's objections. Voluminous and well settled case law regarding judicial review of IRB findings controls this Court's examination of challenges to IRB Opinion and Decisions. In general, findings of the IRB are entitled to "great deference." *E.g., United States v. International Bhd. of Teamsters [Friedman & Hughes]*, 905 F.2d

610, 616 (2d Cir.1990), *aff'g* March 13, 1990, Opinion & Order, 743 F.Supp. 155 (S.D.N.Y. 1990); *United States v. International Bhd. of Teamsters [Raimondi & Bertino]*, 829 F.Supp. 608, 616–17 (S.D.N.Y.1993) (citing cases); IRB Rules ¶ O. This Court will overturn IRB findings only when this Court determines that they are, on the basis of all the evidence, "arbitrary or capricious." *E.g., United States v. International Bhd. of Teamsters [Sansone]*, 981 F.2d 1362, 1368 (2d Cir. 1992); *United States v. International Bhd. of Teamsters [Wilson, Weber & Dickens]*, 978 F.2d 68, 71 (2d Cir.1992); *Cimino*, 964 F.2d at 1311–12; *United States v. International Bhd. of Teamsters [Senese & Talerico]*, 745 F.Supp. 908, 911, *aff'd* 941 F.2d 1292 (2d Cir.1991); *Raimondi & Bertino*, 829 F.Supp. at 616; IRB Rules ¶ O. Having carefully reviewed the IRB's Opinion and Decision, as well as the exhibits attached thereto, this Court finds that the IRB's decision is not arbitrary or capricious. *See* (IRB Rules, ¶ O) ("In reviewing actions of the IRB, this Court shall apply the same standard of review applicable to review of final federal agency action under the Administrative Procedure Act."); *see also United States v. International Bhd. of Teamsters [Ruane]*, 88 Cv. 4486, 1994 WL 178135, at *2 (S.D.N.Y. May 6, 1994).

Regarding Simpson's objections to Application XXI, the papers that Simpson submitted to this Court contain seven separate challenges to the IRB Opinion and Decision regarding the disciplinary charges against him. Each challenge focuses on an alleged distinct error in the IRB Opinion and Decision. This Court's review of Simpson's objections, however, reveals that his seven objections actually raise only five issues: (1) whether the IRB's use and evaluation of evidence was flawed; (2) whether Peters's consent decree was a bar order; (3) whether the IRB is biased; (4) whether the IRB Opinion and Decision was constitutional; and (5) whether the sanction that the IRB imposed upon Simpson was disproportionate. Each of these objections is examined in turn.

### A. Simpson's Objections to the IRB's Use and Evaluation of Evidence.

Three of the objections that Simpson raises in opposition to the IRB Opinion and

Decision concern the manner in which the IRB used, interpreted, or evaluated the evidence it received during Simpson's disciplinary proceedings. Although Simpson explains each of these objections in painstaking detail, they are easily summarized.

According to Simpson, his hearing testimony and post-hearing memorandum proved that the charges that the IRB lodged against him "were without merit." (Simpson's Objections at 17–20.) Simpson claims that the IRB found that the charges against him had been proved by ignoring or misinterpreting evidence and testimony that proved Simpson innocent of these charges. *Id.* at 32, 43. He further maintains that the IRB's findings rely on new charges and new evidence that were not contained in the Proposed Charges originally served on him. *Id.* at 17–20.

■ This Court reviews evidentiary objections to IRB findings under the "substantial evidence" standard. *United States v. International Bhd. of Teamsters [DiGirlamo],* 19 F.3d 816, 820 (2d Cir.1994); *Cimino,* 964 F.2d at 1311–12. "Substantial evidence is more than a mere scintilla"; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cimino,* 964 F.2d at 1313 (quoting *Consolidated Edison Co. v. National Lab. Rel. Bd.,* 305 U.S. 197, 229, 59 S.Ct. 206, 216–17, 83 L.Ed. 126 (1938)). The "substantial evidence standard may be met despite 'the possibility of drawing two inconsistent conclusions from the evidence.'" *DiGirlamo,* 19 F.3d at 820 (quoting *Consolidated Edison,* 305 U.S. at 229, 59 S.Ct. at 216–17).

■ When reviewing IRB findings under this standard, this Court "does not reweigh the evidence presented at the disciplinary hearing; instead [it] only look[s] to see whether adequate evidence was presented to support the [IRB]'s conclusion." *Cimino,* 964 F.2d at 1313. Moreover, the IRB's conclusion need not make specific findings regarding each claim made by the respondent, each piece of evidence presented, or the credibility of each witness. *Id.* In addition, this Court will not substitute its assessment of a witness's credibility for that of the IRB because the IRB is present during such testimony and thus "is best equipped to evaluate the demeanor, credibility, and culpability of those who appear before [it]." *United States v. International Bhd. of Teamsters [DiGirlamo],* 824 F.Supp. 410, 418 (S.D.N.Y.1993); *see Cimino,* 964 F.2d at 1313; *United States v. International Bhd. of Teamsters [Ligurotis],* 814 F.Supp. 1165, 1178 (S.D.N.Y.1993).

■ Having reviewed all the evidence adduced at Simpson's hearing as well as the IRB's findings regarding this evidence, this Court finds that IRB Opinion and Decision in Application XXI is sound for three reasons. First, "substantial evidence" supports the IRB's conclusion that the disciplinary charges against Simpson were proved. Second, the manner in which the IRB used, interpreted, and evaluated this evidence was neither arbitrary nor capricious. Third, Simpson's claims regarding new charges and new evidence are meritless.

1. The evidence adduced at Simpson's hearing supports the IRB's finding that the charges against Simpson were proved.

The evidence presented by both the IRB and Simpson at Simpson's hearing supports the IRB's charge that Simpson "allowed and facilitated Donald Peters's continued representation of Local 743 and his continued involvement in IBT affairs" by engaging in conduct that "included, but was not limited to" six specific acts. (Proposed Charges at 33–34.) Simpson's assertion that the evidence he presented to the IRB proved that the IRB's charges against him were meritless is wholly inaccurate.

In his hearing testimony, Simpson admits to most of the specific incidents of conduct that the IBT detailed in the Proposed Charges against him. For example, the IRB charged that Simpson "provid[ed] Peters with an office on Local 743 premises," and that he "allow[ed] Local 743 to pay for expenses in connection with meetings attended by [Simpson], Peters and others where union business was discussed...." (Proposed Charges at 34.) In response to questioning by his own attorney, Simpson stated that he had done both of these things. (Tr. 73–75) (testimony regarding office); *id.* at 73, 130 (testimony regarding expenses). Simpson

similarly admitted to other acts included in the IRB's Proposed Charges, including inviting Peters to address a 1991 meeting of shop stewards, *id.* at 122, allowing Local 743 to pay Peters's travel expenses in conjunction with Peters's attendance at the 1991 IBT Convention, *id.* at 143, and approving a resolution authorizing Local 743 to reimburse Peters for other travel expenses. *Id.* at 126–27.

Although the aforementioned portions of Simpson's hearing testimony alone support the IRB's finding that the charges against Simpson had been proved, additional evidence supports the IRB's findings regarding Simpson. The IRB received from Chief Investigator Carberry three volumes of exhibits that document many of the charges against Simpson. (Tr. 12.) These exhibits include evidence such as receipts for travel and meal expenses for which Local 743 reimbursed Peters, *see, e.g.,* (I.O.Exs. 51–L–O, 55–56), minutes of meetings pertaining to Local 743 business that record Peters's and Simpson's attendance at those meetings, (I.O.Ex. 80), and records demonstrating Peters's use of an office on Local 743's premises. (I.O.Ex. 43.) Accordingly, this Court finds that Simpson's testimony and the IRB's exhibits provide more than "substantial evidence" that the charges against Simpson had been proved

2. Simpson's objection to the IRB's evaluation of evidence.

██ By claiming that the IRB ignored or misinterpreted the evidence that shows that Simpson did not engage in any misconduct, Simpson invites this Court to reweigh the evidence and reassess the IRB's credibility determinations in direct contravention of the well settled case law that governs judicial review of IRB findings. When reviewing IRB decisions, this Court neither reweighs the evidence presented at the disciplinary hearing, *Cimino,* 964 F.2d at 1313, nor substitutes its judgement regarding witness credibility for the judgment of the IRB. *Di-Girlamo,* 824 F.Supp. at 418; *see Cimino,* 964 F.2d at 1313. This Court merely reviews the IRB Opinion and Decision for "substantial evidence" supporting the IRB's findings.

*Cimino,* 964 F.2d at 1313. As previously stated, this Court's examination of the IRB Opinion and Decision in Application XXI reveals "substantial evidence" supporting each of the IRB's findings regarding both the evidence and the witnesses in Simpson's case. Consequently, this Court finds the IRB's findings regarding are neither arbitrary nor capricious.

3. The IRB Opinion and Decision is not based on new charges or new evidence.

In his objections to Application XXI, Simpson claims that the IRB relied on "new charges" and "new evidence" in order to prove the disciplinary charges against him. (Simpson's Objections at 17–18.) After comparing both the charges and the evidence with which the IRB originally served Simpson with those upon which the IRB relied in its Opinion and Decision, this Court concludes that Simpson's claim is meritless.

This Court finds that the IRB Opinion and Decision only addresses the Proposed Charges contained in the June 30, 1994, investigatory report. As previously discussed, the IRB charged that Simpson "allowed and facilitated Donald Peters's continued representation of Local 743 and his continued involvement in IBT affairs" by engaging in conduct that "included, but was not limited to" six specific acts. (Proposed Charges at 33–34.) The IRB Opinion and Decision makes clear that these charges, and only these charges, were proved.

The only accusations that the IRB discusses in its Opinion and Decision are the charges contained in the Proposed Charges originally served on Simpson in October 1994. In the Opinion and Decision, the IRB states its finding "that Simpson facilitated Peters's continued representation of Local 743 through Peters's continued involvement in IBT affairs...." (IRB Opinion and Decision at 2); *see id.* at 37. The IRB also explains the significance of the evidence against Simpson. For example, the IRB states that by permitting Peters to have "exclusive possession of pertinent [union] information ... [Simpson] permitt[ed] Peters to remain an important figure in the Local's contract negotiations and enforcement efforts

with employers." *Id.* at 13. The IRB continues that, as a result of this conduct, "Peters was permitted by Simpson to continue to function as a union representative...." *Id.* The IRB also states that at certain union meetings, Peters "actually acted as a Local representative in dealing with non-Teamster unions," *id.* at 13–14, and that "[b]ecause of Simpson's projection of Peters, employers regarded him as a force within the Local." *Id.* at 15. As these excerpts demonstrate, the IRB Opinion and Decision contains no language that even suggests that the IRB sanctioned Simpson for any charge other than allowing and facilitating Peters's continued representation of Local 743.

Similarly, the IRB's findings regarding the disciplinary charges against Simpson rely for support solely on evidence of conduct that falls within the scope of the Proposed Charges. Both Simpson's own testimony and the exhibits that the IRB received at the hearing reflect specific incidents of· conduct that occurred subsequent to October 1, 1989—the earliest date within the time frame of the Proposed Charges. For example, Simpson testified that he permitted Peters to occupy an office on Local 743 premises after October 1, 1989, until Peters discontinued his contacts with the Local in 1993. (Tr. 153–55.) Simpson admitted that he attended meetings with Peters during which Local 743 business was discussed, and for which Simpson permitted Local 743 to pay the expenses. *Id.* at 130. These meetings occurred "[b]etween October of 1989 and up to 1993...." *Id.* In addition, both Simpson's approval of the resolution authorizing Local 743 to reimburse Peters for both his travel expenses to the 1991 IBT Convention and his invitation to Peters to address a 1991 meeting of union shop stewards occurred in 1991. *Id.* at 143, 122.

The documentary evidence that the IRB received at the hearing also memorializes conduct that Simpson engaged in subsequent to October 1, 1989. For example, Chief Investigator Carberry submitted to the IRB seventeen invoices reflecting charges for meals that Simpson, Peters, and others attended for the purpose of conducting Local 743 business. (I.O.Exs. 51–A to Q.) The dates of these invoices span the time period from October 10, 1989, to March 8, 1991. *Id.* Carberry also introduced the minutes of numerous meetings pertaining to Local 743 business that both Peters and Simpson attended. (I.O.Exs. 71, 80–82.) These meetings took place in 1990 and 1991. *Id.* In addition, an exhibit submitted by Simpson provides a copy of the letter from Peters to Simpson in which Peters resigned from his contacts with Local 743, including his office on Local 743's premises. (Respondent Simpson's Exhibits, Ex. 32 at 3.) The letter is dated August 10, 1993. *Id.*

Although Simpson is correct that the IRB Opinion and Decision discusses events that occurred prior to October 1, 1989, he is mistaken that any of these events constitutes evidence of conduct for which the IRB sanctioned Simpson. Rather, the IRB discusses Simpson's pre-October 1, 1989, conduct only for purposes of background and rebuttal. For instance, the IRB commenced the discussion section of its Opinion and Decision by declaring that "[e]ssential to an understanding of the proposed charges against Simpson is knowledge of Peters's background and his relationship to Simpson." (IRB Opinion and Decision at 2.) The IRB then devoted approximately fifteen pages to providing this background data before moving to its discussion of the events that constitute the bases of the charges against Simpson. *See id.* at 2–17.

The IRB's explanations for rejecting Simpson's defenses, as well as its findings regarding witness credibility similarly cite evidence of Simpson's pre-October 1, 1989, conduct. For instance, the IRB "reject[s] Simpson's explanation for permitting Peters's continuing involvement in Local and Fund affairs," by citing evidence of Simpson's pre-October 1, 1989, conduct that contradicts this explanation. (IRB Opinion and Decision at 32); *see also id.* at 12–13, 17. The IRB also cites Simpson's pre-October 1, 1989, conduct to demonstrate that Simpson's hearing testimony was inconsistent with his prior statements, and that his credibility as a witness is therefore suspect. *Id.* at 33–34. In addition, the IRB also found that Simpson's treatment of Peters prior to October 1, 1989, was con-

sistent with Simpson allowing Peters to be a representative of the Local after October 1, 1989, *id.* at 5, 8–9, and that this treatment belies Simpson's assertion that he did not engage in a pattern of conduct that violated the IBT Constitution. *Id.* at 33.

Despite the explanations that the IRB provides for its various uses of pre-October 1, 1989, evidence, Simpson maintains that specific portions of the IRB Opinion and Decision are based on new evidence and new charges. Specifically, Simpson contends that the IRB's findings regarding his misconduct rely in part on the "new charge" that Simpson embezzled Local 743 funds by causing the Local to pay for Peters's travel expenses in order to further Simpson's political career. (Simpson's Objections at 23.) After reviewing the portions of the IRB Opinion and Decision that discuss this event, however, this Court rejects this contention.

As clearly recorded in the hearing transcript, Simpson himself introduced the evidence of his embezzlement to the IRB. While attempting to justify the fact that he authorized Local 743 to pay for certain of Peters's travel expenses—a specific instance of misconduct of which the Proposed Charges originally accused him—Simpson revealed that he authorized the payments so that Peters could assist Simpson in Simpson's campaign for International Office. (Tr. 126–30.) As the IRB notes, using Local 743 funds to help Simpson obtain a position as an IBT Trustee constitutes an unauthorized expenditure of union funds for personal benefit in contravention of 29 U.S.C. § 501(c). (IRB Opinion and Decision at 35.) This Court thus finds that this objection is meritless.

### B. Simpson's Claim that the IRB Erroneously Interpreted Peters's Consent Decree.

Simpson's second objection to the IRB Opinion and Decision concerns the IRB's interpretation of Peters's consent decree. According to Simpson, the IRB erroneously concluded that Peters's consent decree was a bar order that prohibited contacts between Peters and members of Local 743, including Simpson. (Simpson's Objections at 24–31.)

Simpson claims that this conclusion ignores uncontroverted evidence to the contrary, *id.* at 24–28, and that the IRB Opinion and Decision is thus arbitrary and capricious. *Id.* at 31.

In claiming that the IRB mischaracterized Peters's consent decree, Simpson completely has missed the thrust of both the disciplinary charges against him and the IRB's stated findings regarding those charges. The IRB's Opinion and Decision is not premised, as Simpson suggests, upon a finding that Simpson merely had contact with Peters, or that Simpson permitted Peters to have contact with Local 743 members. On the contrary, it is based on the IRB's finding that Simpson violated the IBT Constitution by allowing Peters to have, and to be perceived as having, extensive involvement in and continuing influence over the ongoing affairs of Local 743. (IRB Opinion and Decision at 2, 37.) In fact, the IRB itself explicitly states that its "findings are not based on 'associating or working with'" Peters, but "rather are based on, among other things, Simpson maintaining Peters as a representative of the Local." *Id.* at 27–28. Accordingly, this Court finds that Simpson's claim that the IRB misinterpreted Peters's consent decree should be dismissed.

### C. Simpson's Allegations that the IRB Is Biased.

In both Simpson's Objections and the August 1992 Motion, Simpson alleges that the IRB is biased, and claims that the IRB's bias denied Simpson a fair and impartial hearing. (Simpson's Objections at 56–61); (Simpson's Memo at 2–3); (Simpson's Reply Memo at 1–8.) Accordingly, Simpson moves this Court to "recus[e] the current members of the IRB from continuing to participate in adjudicating the proposed charges returned against Simpson...." (August 1995 Motion at 1.) According to Simpson, the IRB is biased against him because Simpson is a political opponent of IBT General President Ron Carey, and the IRB is partial to Carey. Simpson explains the basis of these allegations through the papers and exhibits that he submitted to this Court.

Simpson first refers this Court to a rift that allegedly arose between Simpson and Carey following the August 1993 letter that Simpson sent to Carey, questioning Carey's handling of IBT funds. (Simpson's Objections at 56.) Simpson describes himself as "one of the most vocal opponents of Carey after Simpson discovered [the] financial improprieties committed by the Carey administration...." (Simpson's Reply Memo at 4.) Simpson further asserts "that no one in the IBT poses a bigger threat to Carey at the 1996 IBT Convention than Simpson...." *Id.*

Simpson next contends that the IRB is partial to Carey, and offers three pieces of evidence in support of this charge. First, Simpson states that "evidence of the IRB partiality toward Carey can be found in its decision whitewashing the charges against Carey." *Id.* Simpson explains that in 1994, the IRB conducted an investigation into charges that Carey knowingly associated with members of organized crime, and that Carey was an LCN associate. (Simpson's Memo at 2.) These allegations originated in part from Michael Morony, deputy trustee to Thomas Puccio, Esq. ("Puccio"), the court-appointed trustee of IBT Local 295. *Id.* In July 1994, the IRB issued a report clearing Carey of these charges. (Simpson's Memo at 2.) According to Simpson, the IRB's decision "totally ignored" credible evidence that Carey was connected to LCN. (Simpson's Objections at 57.) To bolster this charge, Simpson submitted to this Court copies of three letters from various individual Teamsters and IBT Locals that criticize the IRB's handling of the allegations against Carey. (August 1995 Motion, Ex. B–C, F.)

Next, Simpson provides this Court with a copy of a letter written by Lacey. (August 1995 Motion, Ex. E ("Puccio Letter").) In this letter, Lacey reiterates a telephone conversation he had with Puccio in which Puccio told Lacey that "unless the IRB agreed to the trusteeship of 295 being extended to 951, [Puccio was] going to go public with all the materials that [Puccio] had on Carey." (Puccio Letter at 1.) As stated in the Puccio Letter, Lacey responded to Puccio's statement as follows:

During our conversation, I told you what I thought you and Mr. Moroney ought to have in mind what would happen if you brought Carey down in that there were "old guard" Teamsters throughout the country that were hoping that Carey would be eliminated as a candidate in 1996 so that the clock could be turned back to what it was when I first came on the scene as Independent Administrator. You indicated that you had not given any thought to that but you would keep it in mind.

*Id.*

Simpson contends that the Puccio Letter is another example of the IRB's bias. Simpson argues that the above-quoted statement by Lacey

is not a statement which can be taken lightly considering the punishment handed out against Simpson and the supposed impartiality of the IRB. Judge Lacey's enormous influence and control over the IRB is readily apparent. Judge Webster is a Lacey Nominee. Moreover, Lacey heads all the hearings for the IRB.

(Simpson's Objections at 57.) Simpson further claims that when Lacey's remarks are "viewed in the context of a political dispute between Carey and Simpson, it is highly inappropriate for Judge Lacey to have sat on the IRB panel judging Mr. Simpson." *Id.* at 58.

Finally, Simpson submits to this Court a copy of a May 15, 1995, article from *Time* magazine. (August 1995 Motion, Ex. D ("*Time* Article").) The *Time* Article reviews Lacey's role under the IBT Consent Decree and reports of growing criticism of Lacey's judgement regarding Carey. *Id.* It also discusses and quotes from the Puccio Letter. *Id.* According to Simpson, the issues raised in the *Time* Article "go to the heart of the Consent Decree and directly implicate the high ethical standards imposed by this Court on officers appointed to implement the decree." (Simpson's Objections at 58); (Simpson's Memo at 3.)

According to Simpson, the aforementioned evidence establishes that Carey and Simpson are adversaries, that the IRB is partial to Carey, and that the IRB is therefore biased

against Simpson. Simpson maintains that this bias inspires the current "political persecution" of Simpson, (Simpson's Objections at 57), and supports his motion to recuse the IRB. He argues that this Court's previous decisions regarding the standard of behavior expected of the officers who implement the Consent Decree mandate this result. (Simpson's Objections at 58–60); (Simpson's Memo at 4–5.)

Regarding the standard that governs Simpson's recusal motion, Simpson suggests two alternatives. First, he offers 28 U.S.C. § 455(a), which in relevant part provides that "[a]ny justice, judge or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." (Simpson's Memo at 6–7.) Simpson contends that under Second Circuit case law, the evidence of the IRB's bias requires the IRB's disqualification under this statute. *Id.* at 7. In the alternative, Simpson argues that recusal of the entire IRB panel would be appropriate under section 10 of the United States Arbitration Act ("USAA"), which states: "an arbitrator award may be vacated if an arbitrator shows 'evident partiality'." 9 U.S.C. § 10. Simpson claims that the evidence of the IRB's bias meets this standard for disqualification. (Simpson's Memo at 7–8.) Although Simpson denies that the IBT Constitution provides the relevant standard for evaluating his recusal motion, *id.* at 14, he submits that Judge Lacey's conduct in this case warrants recusal under the standard established by the IBT Constitution. *Id.* at 15.

Simpson raises one final point regarding his recusal motion. He maintains that he has not waived his right to move this Court to recuse the IRB. (Simpson's Reply Memo at 9.) He reiterates the facts and arguments mentioned above, and claims that "justice requires" that this Court examine the IRB's impartiality. *Id.* at 9–12.

In response to Simpson's allegation of bias and his motion for recusal, Chief Investigator Carberry and the Government each submitted a memorandum of law to this Court. *See generally* (Motion in Opposition to Recusal); (Konigsberg Letter.) In these memos, both Carberry and the Government challenge Simpson's bias and recusal claims. They argue that Simpson's recusal motion is untimely, (Motion in Opposition to Recusal at 2, 5); (Konigsberg Letter at 4–7), and that Simpson cites the wrong recusal standard. (Motion in Opposition to Recusal at 7–11); (Konigsberg Letter at 7–9.) In addition, both Carberry and the Government contend that the IBT Constitution provides the relevant standard for recusal motions arising from IBT disciplinary proceedings, and that under this standard, Simpson's recusal motion must fail. (Motion in Opposition to Recusal at 6–7); (Konigsberg Letter at 7.)

■■■ As noted earlier, the IRB is charged with implementing the remedial and disciplinary provisions of the Consent Decree. "Given the IRB's mission, it is apparent that a person who accepts an appointment on the IRB assumes an awesome responsibility." *United States v. International Bhd. of Teamsters [Webster Appointment]*, 803 F.Supp. 806, 815 (S.D.N.Y.1992). To discharge this responsibility, "each IRB member must exercise his or her authority independently, fairly, courageously, and without bias, fear or sympathy." *Id.* As this Court has noted:

> The Independent Review Board is broadly empowered to eliminate corrupt elements of the IBT. Such a task requires detachment, for the very presence in the Consent Decree of an IRB—like the Court–Appointed Officers before it—testifies to the difficulties of internal policing. Therefore, to accomplish its tasks, each IRB member must be fair and independent.

*IRB Rules Decision*, 803 F.Supp. at 796.

The failure of any IRB member to exercise his authority fairly and independently would have grave implications for the Consent Decree and the IBT, itself. The presence of a biased or partisan member on the IRB could result in IBT members or entities being unfairly disciplined, or conversely, IBT members or entities wrongly escaping discipline. *Webster Appointment*, 803 F.Supp. at 815. It also could undermine the confidence that rank-and-file IBT members have in the IRB's ability to eradicate corruption within the Union. Accordingly, such risks must be avoided by all means possible.

This Court has labored tirelessly toward the goal of ensuring that the Consent Decree is not undermined. This Court repeatedly has proclaimed its intolerance of bias among IRB members. *Webster Appointment,* 803 F.Supp. at 815; *IRB Rules Decision,* 803 F.Supp. at 796–97. It has vigilantly screened persons nominated to serve on the IRB to ensure that none possess the slightest trace of conflict, partiality, or favoritism. *Webster Appointment,* 803 F.Supp. at 815–18. It has painstakingly reviewed the disciplinary actions taken against every Teamster since the Consent Decree was entered, in order to ensure that the IRB provided each Teamster with the fair and complete process due him under the Consent Decree. Consequently, this Court is gravely concerned by the instant allegations of bias and the related recusal request.

Although this Court has had occasion to address a recusal motion in the context of an IBT disciplinary proceeding, *Ligurotis,* 814 F.Supp. at 1170–75, this Court has never before faced a claim that the IRB is biased. Moreover, this Court has never articulated the legal standard that governs either claims that an IRB Opinion and Decision should be reversed because the IRB acted out of bias or a claim that the IRB should be recused. Simpson's allegations, however, place both these issues squarely before this Court. To resolve them, this Court will first define the legal standard applicable to motions to recuse IRB members, then apply this standard to the facts at hand.

As the following analysis demonstrates, the IBT Constitution provides the standard for evaluating motions to recuse IRB members. Simpson's claim that the IRB is biased not only falls short of this standard but also fails to demonstrate that the IRB is biased against him.

1. The legal standard for recusing members of the IRB.

As previously discussed, Simpson, Chief Investigator Carberry, and the Government advance a total of three different standards for evaluating a motion to recuse a member of the IRB: (1) Title 28, United States Code, section 455(a) ("Section 455(a)"); (2) section 10(b) of the United States Arbitration Act, 9 U.S.C. § 10(b); and (3) the IBT Constitution. This Court will examine the substance of each standard in turn in order to determine which is applicable to the instant recusal motion.

Section 455(a) in relevant part provides that "[a]ny justice, judge or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). As the statutory language makes clear, this provision applies solely to members of the federal judiciary. *See* 13A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *et al.,* Federal Practice & Procedure: Civil § 3541–42 (1984). This statute creates an objective standard for disqualification of members of the federal judiciary. *United States v. International Bus. Mach. Corp.,* 475 F.Supp. 1372, 1389 (S.D.N.Y.1979); 13A Wright, Miller & Cooper, § 3542, at 556–57. The test for whether a judge should be recused is "whether facts have been presented that, assuming their truth, would lead a reasonable person to infer that bias or prejudice existed, thereby foreclosing impartiality." *United States v. Corr,* 434 F.Supp. 408, 412–13 (S.D.N.Y. 1977); *United States v. IBM,* 475 F.Supp. at 1389; 13A Wright, Miller & Cooper, § 3542, at 556–57.

The United States Arbitration Act sets forth a standard under which a court may vacate an arbitration award on the ground that the arbitrator's decision was the result of bias. Section 10(b) of the USAA provides that upon application of any party to an arbitration, a court may vacate an arbitration award "[w]here there was evident partiality or corruption in the arbitrators...." 9 U.S.C. § 10(b). It is well settled that a mere appearance of bias is insufficient to demonstrate evident partiality, *Morelite Constr. Corp. v. New York City Dist. Council Carpenters Benefit Funds,* 748 F.2d 79, 83 (2d Cir.1984), because arbitrators are not held to the high standards of impartiality that 28 U.S.C. § 455(a) establishes for members of the federal judiciary. *Commonwealth Coatings Corp. v. Continental Casualty Co.,* 393 U.S. 145, 150, 89 S.Ct. 337, 340,

21 L.Ed.2d 301 (1968); *Peoples Sec. Life Ins. Co. v. Monumental Life Ins. Co.*, 991 F.2d 141, 146 (4th Cir.1993). In the Second Circuit, evident partiality exists "where a reasonable person would have to conclude that an arbitrator was partial to one party to the arbitration." *Local 814 v. J & B Syst. Installers & Moving, Inc.*, 878 F.2d 38 (2d Cir.1989). Although the USAA does not require a party to prove actual bias, the party must demonstrate "more than speculation that amounts to a claim that there is an 'appearance of bias'." *Id.*

Finally, the IBT Constitution provides the rules for adjudging claims that an IBT member violated the IBT Constitution. IBT Constitution, Art. XIX. The IBT Constitution is the IBT's governing document. It is an agreement among the members, local unions, and International that "recognizes and protects the autonomy, integrity and identity of each indispensable part of" the IBT. *Id.* prmble. This agreement sets forth the Union's operating rules, as well as the rights, duties, and protections to which each Union member is entitled. The IBT Constitution also confers jurisdiction to the IBT "over all workers including, without limitation, teamsters, chauffeurs, warehousemen and helpers." IBT Const. Art. II, § 1(a). It imposes upon Union members the duty to obey both the Constitution and the rulings of the General Executive Board, *Id.* Art. II, § 2(a), as well as to avoid engaging in specific conduct that constitutes an offense against the Union. *Id.* Art. XIX, §§ 7–9. In the event that a Union member fails to uphold these duties, the IBT Constitution empowers both the General President and the General Executive Board of the IBT to take action against the member. *Id.* Art. VI, § 2, Art. IX, § 3.

Article XIX of the IBT Constitution governs trials and appeals of local union officers and members accused of committing offenses against any IBT entity. Section 1(a) states in part:

> In no event shall any involved officer or member serve on a hearing panel, participate in the selection of a substitute member of a hearing panel, or participate in the decision making process of the trial body. This prohibition shall apply to any proceeding conducted under Article XIX or any other Article of this Constitution.

*Id.* Art. XIX, § 1(a). Section 5, which establishes the jurisdiction of the IBT GEB to try offenses against the International Union, incorporates this standard by reference and explicitly applies it to "any proceeding" brought pursuant to its authority. *Id.* Art. XIX, § 5(b).

Having reviewed these three standards, as well as applicable case law, this Court finds that the IBT Constitution provides the appropriate standard for reviewing motions to recuse IRB members. As stated earlier, this Court previously has resolved a recusal motion arising from an IBT disciplinary proceeding. *Ligurotis*, 814 F.Supp. at 1170–75. In *Ligurotis*, a Teamster argued to this Court that the IA—Lacey—should have disqualified himself from the Teamster's disciplinary hearing, pursuant to either Section 455 or the USAA. *Id.* at 1170. In response to this argument, this Court held that "Section 455 controls only the disqualification of justices, judges, and magistrates," and that because Lacey was not a judge, justice, or magistrate during the time he served as IA, "Section 455 d[id] not control the disqualification of Judge Lacey." *Id.* at 1170–71.

■ This Court's ruling in *Ligurotis* regarding the disqualification of Judge Lacey as IA also controls the instant motion to recuse members of the IRB. Accordingly, because Section 455 is inapplicable to motions to recuse the IA, this Court holds that Section 455 is inapplicable to Simpson's motion to recuse the IRB.

In addition, in *Ligurotis* this Court discussed the disqualification provisions contained in both section 10(b) of the USAA and Article XIX, section 1(a) of the IBT Constitution. *Id.* at 1171. This Court did not reach the issue of whether either provision controlled recusal motions arising from IBT disciplinary proceedings. This Court did, however, analyze Ligurotis's recusal claim under each standard and concluded that disqualifying Lacey was inappropriate under either one. *Id.* at 1171–75.

■ This Court now finds that section 10(b) of the USAA is inapplicable to mem-

**1104**

bers of the IRB. The USAA manifests a "federal policy favoring arbitration." *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983). Section 2 of the USAA declares that "[a] written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy arising out of such contract or transaction," is "valid irrevocable, and enforceable," 9 U.S.C. § 2, and the act's remaining sections "create[ ] a body of federal substantive law establishing and regulating the duty to honor an agreement to arbitrate." *Moses H. Cone*, 460 U.S. at 25 n. 32, 103 S.Ct. at 941 n. 32. As its purpose and terms make clear, the USAA applies only to written agreements to arbitrate disputes arising out of commercial or maritime transactions. Simpson, however, argues neither that any written agreement to arbitrate exists among the parties, nor that Simpson's internal Union disciplinary proceeding is a commercial or maritime transaction within the USAA's scope. Accordingly, this Court finds that the USAA is inapplicable to judicial review of internal IBT disciplinary hearings, and that Simpson's claim that section 10(b) of the USAA governs the disqualification of members of the IRB must be rejected.

■ Finally, this Court's discussion in *Ligurotis* of the recusal standard contained in the IBT Constitution is instructive in the instant case. In *Ligurotis*, this Court stated:

> Yet another alternative standard recognizes that the Independent Administrator is an analog to the GEB and the IBT General President in the disciplinary sphere. In this vein, the Independent Administrator enjoys the same disciplinary powers as the GEB and the IBT General President. See Consent Decree, § F.12(A). The standards governing disqualification of these entities could also apply to the disqualification of the Independent Administrator: "In no event shall any involved officer serve on a hearing panel." IBT Const. Art. XIX, § 1(a). Thus, recusal of the Independent Administrator would be appropriate under such

standard only if he is 'involved' in a dispute.

814 F.Supp. at 1171. As this Court repeatedly has noted, the IRB succeeded the IA and possesses the same authority that the IA possessed. Consequently, this Court finds that the recusal standard contained in the IBT Constitution is equally applicable to both the IA and the IRB.

■ This Court holds that the recusal standard contained in the IBT Constitution is the appropriate standard for the recusal of an IRB member. The IBT Constitution provides the authority for instituting disciplinary proceedings against Union members accused of engaging in misconduct. Article XIX of the IBT Constitution establishes the rights and procedures to which all Union members subject to such disciplinary action are due, including the right to recuse a hearing officer. In addition, the IBT Constitution authorizes the establishment of the IRB, *id.* Art. XIX, § 14(a), and grants the IRB the power to "decide all cases referred to it in accordance with Article XIX of this Constitution. . . ." *Id.* Art. XIX, § 14(b)(1). It further vests the IRB with "the authority to exercise any investigative authority vested in the General President or General Secretary–Treasurer by the 1986 Constitution and/or this Constitution, as well as any and all applicable provisions of law." *Id.*, Art. XIX, § 14(b)(3). Under these provisions, the same rules and standards applicable to disciplinary actions undertaken by the IBT General President, General Secretary–Treasurer, or GEB are applicable to disciplinary actions taken by the IRB. (Consent Decree, § F.12(A)); *see Ligurotis*, 814 F.Supp. at 1171. Consequently, because the recusal standard contained in the IBT Constitution governs the question of recusal in disciplinary actions overseen by the IBT General President, General Secretary–Treasurer, or GEB, this standard also governs the question of recusal in disciplinary actions taken by the IRB.

The instant IRB Application concerns a disciplinary proceeding held pursuant to the IBT Constitution. Simpson is charged with violating specific provisions of the IBT Constitution. The · investigation regarding

Simpson's misconduct was conducted by Chief Investigator Carberry acting pursuant to the authority granted him by the IBT Constitution and the Consent Decree. The IRB held the hearing on the charges against Simpson pursuant to the authority conferred upon it by the IBT Constitution. IBT Const. Art. XIX, § 14(c)(4). The post-hearing procedures in Simpson's case, including this Court's review of the IRB Opinion and Decision in Application XXI, are governed by rules promulgated pursuant to procedures authorized by the IBT Constitution. *IRB Rules Decision*, 803 F.Supp. at 804–06. Accordingly, the recusal standard contained in the IBT Constitution controls the instant recusal motion, which Simpson has brought to challenge an internal Union disciplinary proceedings conducted by the IRB pursuant to the IBT Constitution and the Consent Decree.

2. Simpson's motion to recuse Lacey.

 Applying the recusal standard set forth in the IBT Constitution to the instant case, this Court must determine whether Lacey was "involved" in the events that form the bases of the IBT's disciplinary charges against Simpson. This Court finds that Lacey was not involved in these events. As the Government correctly argues, "Simpson has offered no evidence or even a bare allegation, that Judge Lacey or any other IRB member was involved in the actions that form the basis of the charges against Simpson." (Konigsberg Letter at 7–8.) A review of the papers that Simpson submitted in support of his recusal motion and his bias claim reveals that the only basis for Simpson's recusal motion is Simpson's belief that Lacey and the other members of the IRB harbor personal biases against Simpson, and that these biases corrupted Carberry's investigation and the IRB's adjudication of the charges against Simpson. Simpson's mere assertion that Lacey is biased is no substitute for evidence of Lacey's involvement in the events that formed the basis of the charges against Simpson. Moreover, Simpson has not even attempted to explain his claim that the entire IRB should be recused because of Lacey's alleged bias. Even if Lacey were involved in the events that formed the basis of the

charges against Simpson—and there is no evidence that Judge Lacey was involved—the fact that one IRB member should be recused does not substantiate a motion to recuse the other members of the IRB. In addition, this Court finds that Simpson's allegations of bias, even if true, in no way demonstrate that any IRB member was involved in the events or actions upon which the charges against Simpson are based. Accordingly, this Court finds that neither Lacey nor the other members of the IRB were "involved officer[s]" subject to recusal under Article XIX, section 1(b) of the IBT Constitution.

 Although it is clear that no member of the IRB is "an involved officer," and that Simpson is not entitled to have any IRB member recused pursuant to the IBT Constitution, Simpson nevertheless maintains that Lacey and the IRB are biased against him, and that such bias alone warrants the IRB's disqualification from his case. Despite the attention that Simpson, Carberry, and the Government devote to the question of bias in the papers that they respectively submitted to this Court, none of the three suggests a standard under which this Court should evaluate Simpson's claims. This Court, however, need not decide today what constitutes bias in an internal IBT disciplinary proceeding for two reasons: (1) the parties have not placed this issue before this Court; and (2) in light of this Court's discussion of Simpson's recusal motion, this Court finds that under any reasonable definition of the term "bias," Simpson's claims are meritless.

According to the dictionary, bias is "an inclination of temperament or outlook," particularly "such prepossession with some object or point of view that the mind does not respond impartially to anything related to this object or point of view." Webster's Third Int'l Dictionary 211 (1971). More simply put, bias is prejudice. *Id.*

Simpson's claim of bias is meritless. Although Simpson claims that the Puccio Letter and the *Time* Article demonstrate that Lacey is biased in favor of Carey, these pieces of "evidence" fail to indicate that Lacey or any other member of the IRB holds any prejudice or partiality against Simpson.

Simpson has provided this Court with no documents or witness testimony that might substantiate Lacey's alleged bias against Simpson. Moreover, Simpson has failed to show that the IRB Opinion and Decision was a product of bias against him.

For example, the Puccio Letter does not establish that Lacey is biased against Simpson. In fact, the letter is wholly unrelated to Simpson—it was not addressed to him, it never mentions him, and it does not discuss any of the events with which Simpson was involved or which form the basis of the IRB's charges against Simpson. The *Time* Article similarly lacks any information or references to Simpson.

Further, the factual and procedural record of Simpson's disciplinary proceeding is devoid of any trace of bias or partiality against Simpson. The IRB Opinion and Decision is written in a neutral, objective, and straightforward manner. It recounts the evidence in Simpson's case without passion or prejudice. Its factual findings and legal conclusions are fully explained and supported by the record and by case law. In addition, this Court's examination of the hearing transcripts reveals that neither Lacey nor any other IRB member engaged in any conduct or commentary suggestive of bias, partiality, or unfairness. In fact, Simpson's counsel admitted as much on the record at the conclusion of Simpson's hearing:

> We felt no pressure. We understand the procedure and the mechanisms of conducting these hearings.

> And we chose not to submit every witness live knowing that the Review Board will review all of the evidence we submit, and we are not suggesting nor do we feel that we've been curtailed in any way whatsoever.

> We've been treated fairly, and we've had an opportunity to present our evidence.

(Tr. at 487.)

As the preceding discussion demonstrates, Simpson's claim that the IRB is biased against him is based solely on Simpson's speculation and conclusory allegations. Simpson has sought to conjure a claim that Lacey is biased against him from a series of inferences based on a single sentence in the Puccio Letter that Simpson claims demonstrates that Lacey is biased in favor of Carey. From this one sentence, Simpson infers that Lacey is partial to Carey, that this alleged partiality makes Lacey biased against Simpson because of an alleged "falling out" between Carey and Simpson, and that this alleged bias against him caused the IRB to take action against Simpson that the IRB otherwise would not have taken. This Court finds that, without any supporting evidence, this tenuous chain of inferences does not substantiate a claim of bias under any reasonable standard. Accordingly, this Court finds that Simpson's bias claim should be dismissed.

**D. Simpson's Constitutional Claims.**

In his objections to Application XXI, Simpson contends that the IRB Opinion and Decision violates his rights under the First and Fifth Amendments of the United States Constitution. (Simpson's Objections at 19, 23, 62.) Although Simpson acknowledges that the Second Circuit repeatedly has held that the actions of court-appointed officers acting pursuant to the IBT Consent Decree do not constitute government action, he "believes that the Second Circuit's conclusion on this point is incorrect," and requests that this Court reconsider the issue and "determine that the IRB is a Government actor whose conduct is subject to the restrictions enumerated in the Constitution and its Amendments." *Id.* at 65. Simpson focuses on two constitutional Amendments in particular.

First, Simpson claims that "IRB's decision is an infringement of Simpson's First Amendment right to free speech and association." *Id.* at 65. He argues that he had a right to consult with Peters on Local-related matters subsequent to Peters's March 1989 consent decree, *id.,* and that the IRB applied a "nebulous standard" when it determined that Simpson "took too long in obtaining valuable union knowledge and information from Peters...." *Id.* at 66. He further contends that none of the consent decrees arising from the settlement of the Government's civil RICO case against the IBT prohibits Simpson "from consulting or communi-

cating with Peters on union business during the time period covered by the IRB's charges," and that absent such prohibitions, Simpson's communications with Peters could neither have violated the Consent Decree nor interfered with the IBT's operation. *Id.* at 66–67. In addition, Simpson claims that each of the contacts between Simpson and Peters that the IRB reviewed in its Opinion and Decision "had a legitimate purpose," and that Simpson is constitutionally entitled to communicate with "prominent and knowledgeable IBT members like Peters" for legitimate purposes that promote and protect the welfare of Local 743. *Id.* at 67. Finally, although Simpson admits that his First Amendment rights "may be curtailed to further significant governmental interests," *id.* (quoting *Senese & Talerico,* 941 F.2d at 1297), he denies that any governmental interest would be served by preventing Simpson from discussing union business with Peters. *Id.*

Second, Simpson contends that the IRB violated the Due Process rights guaranteed him by the Fifth Amendment by "convicting Simpson of uncharged crimes," and by sanctioning him for the unconstitutionally vague wrong of "bringing reproach upon the IBT." *Id.* at 68. He asserts that "the Fifth Amendment requires the IRB to notify Simpson of the charges against which he must respond," but that the IRB failed to do so. *Id.* He continues that "the IRB's acts of convicting Simpson of uncharged crimes is akin to a situation in which the Government impermissibly attempts to constructively amend an indictment returned by a grand jury against a criminal defendant by seeking to broaden the possible bases which would sustain a conviction." *Id.* Finally, he asserts that the charge of "bringing reproach upon the IBT" is "unconstitutionally vague in the circumstance of this case." *Id.*

This Court rejects Simpson's constitutional challenges on two grounds. First, the IRB's conduct does not constitute "state action," and thus, the constitutional provisions that Simpson cites are inapplicable to the IRB. Second, even if this Court were to assume *arguendo* that the IRB's conduct does constitute state action, Simpson's constitutional claims are entirely without merit.

1. State Action.

 It is a basic principal of constitutional law that "most rights secured by the Constitution are protected only against infringement by Government." *Flagg Brothers, Inc. v. Brooks,* 436 U.S. 149, 156, 98 S.Ct. 1729, 1733, 56 L.Ed.2d 185 (1978). As the Supreme Court explained,

> [c]areful adherence to the "state action" requirement preserves an area of individual freedom by limiting the reach of federal law and federal power. It also avoids imposing on the [Government] responsibility for conduct for which they cannot fairly be blamed. A major consequence *is* to require the courts to respect the limits of their own power.... Whether this is good policy or bad policy, it is a fundamental fact of our political order.

*Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 936–37, 102 S.Ct. 2744, 2753, 73 L.Ed.2d 482 (1982).

 A litigant claiming that his constitutional rights have been violated must first establish that the challenged conduct constitutes "state action." *Blum v. Yaretsky,* 457 U.S. 991, 1002, 102 S.Ct. 2777, 2784–85, 73 L.Ed.2d 534 (1982); *Senese & Talerico,* 941 F.2d at 1295. "To qualify as state action the conduct in question 'must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible,' and 'the party charged with the [conduct] must be a person who may fairly be said to be a state actor.'" *Id.* at 1296 (quoting *Lugar,* 457 U.S. at 937, 102 S.Ct. at 2753–54); *Simpson Subpoenas,* 870 F.Supp. at 560. The IRB's actions during the course of Simpson's investigation and hearing meet neither of these criteria.

 First, the IRB does not exercise a "right or privilege created by the State." *Senese & Talerico,* 941 F.2d at 1296. Instead, the IRB acts "solely pursuant to the authority that it derives from the Consent Decree and the [IBT] Constitution." *Simpson,* 870 F.Supp. at 560; *see IRB Rules*

*Decision,* 803 F.Supp. at 800, 802 (stating that "[t]he Consent Decree provides for the establishment of an Independent Review Board," and that the "IRB shall exercise such investigative authority as the General President and General Secretary–Treasurer are authorized and empowered to exercise pursuant to the 1986 IBT Constitution and/or the 1991 IBT Constitution. . . ."); (Consent Decree at 19.) The wrongs with which the IRB charged Simpson, and which the IRB upheld in its Opinion and Decision, are based solely on Simpson's violations of the IBT Constitution, not any provisions of any state or federal law.[3] Consequently, this Court finds that the IRB did not act pursuant to a governmental right or privilege, and thus, the IRB fails to fulfill the first element of the definition of state action.

Second, the IRB "may [not] fairly be said to be a state actor." *Senese & Talerico,* 941 F.2d at 1296. Pursuant to the Consent Decree, the IBT pays all costs and expenses of the IRB, including the salaries of IRB members and staff. (Consent Decree at 23); *see Simpson Subpoenas,* 870 F.Supp. at 560 & n. 3; *IRB Rules Decision,* 803 F.Supp. at 801. Moreover, as mentioned earlier, the IRB exists pursuant to the Consent Decree to which the IBT is a party, and operates under rules established by the Consent Decree and the IBT's own Constitution. Thus, because the IRB was established pursuant to a consensual agreement entered into by the IBT, operates according to rules and procedures set forth in the IBT's governing documents, and is financed entirely by the IBT, this Court finds that the IRB is a private actor. Consequently, the IRB fails to meet the second element of the definition of state action.

This Court's conclusion that the IRB is not a state actor comports with a conclusion reached by the Second Circuit regarding the IA's actions during the first phase of the Consent Decree. The IA had sanctioned two Teamsters for knowingly associating with members of organized crime in violation of the IBT Constitution. *Senese & Talerico,* 941 F.2d at 1294. The Teamsters challenged

these sanctions on the grounds that the sanctions violated their First, Fifth, and Eight Amendment rights under the United States Constitution. *Id.* at 1294–95. In upholding this Court's rejection of the Teamsters' constitutional claims, the Second Circuit held that the IA's imposition of sanctions did not constitute state action and that, as a result, the constitutional provisions under which the Teamsters brought their claims were inapplicable. *Id.* at 1295. The Second Circuit based its holding that the IA was not a state actor on the grounds that the IA acted pursuant to the IBT Constitution, a private agreement, and that the IA was funded and provided an office by the IBT. *Id.* at 1296. Given that the IRB's origins, authorization, and funding are similar, if not identical, to those of the IA, and that the IRB is the "successor" to the IA's disciplinary responsibilities, *Webster Appointment,* 803 F.Supp. at 810, it follows the IRB's conduct does not constitute state action for the same reasons that the IA's conduct did not constitute state action.

This result should come as no surprise to Simpson. As the Government correctly stated in its letter to this Court, this Court previously rejected Simpson's argument that constitutional protections apply to IRB disciplinary hearings. *See* (Konigsberg Letter at 4 (citing *Simpson Subpoenas,* 870 F.Supp. at 560)). In this Court's earlier Memorandum and Order regarding the disciplinary proceedings commenced by the IRB against Simpson, this Court clearly held that Simpson's IRB "hearing does not implicate any of Simpson's constitutional rights because the IRB is not a state actor." *Simpson Subpoenas,* 870 F.Supp. at 560. This holding is consistent with both this Court's and the Second Circuit's well settled position regarding the issue of whether court-appointed officers acting pursuant to the Consent Decree are state actors. *See, e.g., Sansone,* 981 F.2d at 1371; *United States v. International Bhd. of Teamsters [Star Market],* 954 F.2d 801, 806–07 (2d Cir. 1992); *Senese & Talerico,* 941 F.2d at 1296–97. In fact, Simpson concedes as much in

---

**3.** The IRB charged Simpson with violation of Article II, Section 2(a) and Article XIX, Section 7(b)(1) and (5) of the IBT Constitution.

the objections he submitted to this Court. (Simpson's Objections at 62.) Accordingly, this Court finds that the IRB is not a state actor. Without state action, Simpson's First and Fifth Amendment claims must fail.

### 2. Substantive Constitutional Rights.

Even if this Court were to assume *arguendo* that the IRB's conduct constituted state action, Simpson's constitutional claims are meritless.

### a. First Amendment.

As previously discussed, Simpson maintains that the IRB Opinion and Decision violates his right to free speech and association guaranteed under the First Amendment. (Simpson's Objections at 65.) Simpson's First Amendment claims are meritless for two reasons.

■ First, the Labor Management Reporting and Disclosure Act, 29 U.S.C. § 411(a)(2), statutorily curtails the First Amendment rights of union members in the context of union-related activities. LMRDA section 101(a)(2) guarantees members of labor organizations "the right to meet and assemble freely with other members." 29 U.S.C. § 411(a)(2). This right is not absolute, however, because section 101(a)(2) specifically reserves for labor unions the right to "enforce reasonable rules as to the responsibilities of every member toward the organization as an institution," and to sanction its members for "conduct that would interfere with its performance of its legal or contractual obligations." 29 U.S.C. § 411(a)(2); *see United States v. International Bhd. of Teamsters [Friedman]*, 838 F.Supp. 800, 812 (S.D.N.Y.1993); *United States v. International Bhd. of Teamsters [Senese & Talerico]*, 745 F.Supp. 908, 912 (S.D.N.Y.1990), *aff'd*, 941 F.2d 1292 (2d Cir.1991).

Under the Consent Decree, "it is imperative that the IBT, as the largest trade union in the free world, be maintained democratically, with integrity and for the sole benefit of its members and without unlawful outside influence." (Consent Decree at 2.) Toward this goal, the IBT has adopted standards, rules, and procedures for investigating and sanctioning IBT members who fail to uphold their membership responsibilities. *Id.* at 7–27; *IRB Rules Decision*, 803 F.Supp. at 800–05. These standards, rules, and procedures all were established with this Court's approval. *See IRB Rules Decision*, 803 F.Supp. at 799–800; (Consent Decree at 28.)

In its Opinion and Decision, the IRB found that various discussions and meetings involving Simpson and Peters violated Peters's consent decree, the IBT Constitution, and Simpson's duties as an officer of Local 743. (IRB Opinion and Decision at 29, 37.) The IRB also found that Simpson repeatedly placed his own personal interests ahead of Local 743 interests. *Id.* at 37. In light of these findings, the IRB concluded that Simpson "interfered with the Local's legal obligations by allowing Peters to act as a representative and agent of the Local and its Funds in violation of Peters's court approved settlement agreement," and that this conduct violated Article II, section 2(a) and the Article XIX, section 7(b)(1) and (b)(5) of the IBT Constitution. *Id.* at 29. The IRB sanctioned Simpson accordingly. *Id.* at 37.

■ The IRB's actions in this case were undertaken in furtherance of the IBT's stated goal of maintaining its operations "with integrity and for the sole benefit of its members." (Consent Decree at 2); (IRB Rules ¶ A(4).) They comport with the standards, rules, and procedures for investigating and sanctioning Union members that the IBT adopted and that this Court approved. *See generally*, (Consent Decree at 19–23); (IRB Rules.) Although the sanctions the IRB imposed on Simpson were based in part on Simpson's contact and association with Peters, the sanctions were valid because they sought to enforce Simpson's "responsibilities toward the organization as an institution," and to punish "conduct that ... interfere[d] with [the union's] performance of its legal or contractual obligations." 29 U.S.C. § 411(a)(2). As this Court has stated previously, "the IBT's sanctioning members in order to rid itself of corrupt influence conforms with [29 U.S.C. § 411(a)(2) ], and infringes no First Amendment rights." *Friedman*, 838 F.Supp. at 812 (quotation omitted); *see also Turner v. Air Transport Lodge 1894,*

590 F.2d 409, 412 (2d Cir.1978) (Mulligan, J. concurring), *cert. denied,* 442 U.S. 919, 99 S.Ct. 2841, 61 L.Ed.2d 286 (1979).

 Second, "it is well established that an individual's right to freedom of association may be curtailed to further significant governmental interests." *Senese & Talerico,* 941 F.2d at 1297; *see also United States Civil Serv. Comm'n v. National Ass'n of Letter Carriers, AFL–CIO,* 413 U.S. 548, 567, 93 S.Ct. 2880, 2891, 37 L.Ed.2d 796 (1973). The public has a compelling interest in eliminating the "public evils of crime, corruption, and racketeering" in union activity. *Brown v. Hotel & Restaurant Employees and Bartenders Int'l Union Local 54,* 468 U.S. 491, 508, 104 S.Ct. 3179, 3189, 82 L.Ed.2d 373 (1984) (internal quotations omitted). The IRB's investigation and sanction of Simpson advances the IBT's goal of maintaining the integrity of its operations, (Consent Decree at 2), by removing from the Union members who ignore Union rules. The IRB's actions also serve the public interest by curtailing the actions of Union members who perpetuate corruption in the nation's largest union. Consequently, the IRB was fully justified in sanctioning Simpson for his repeated contacts with Peters in violation of Peters's consent decree, the IBT Constitution, and Simpson's duties as an officer of Local 743. Because the sanction that the IRB imposed on Simpson comports with section 101(a)(2) of the LMRDA, and serves the public interest, it is not constitutionally infirm. Accordingly, Simpson's First Amendment claims are without merit.

b. Fifth Amendment.

In addition to his First Amendment claims, Simpson contends that the IRB's actions in this case violate his right to Due Process under the Fifth Amendment of the Constitution. All of the bases that Simpson advances in support of this contention are meritless.

Simpson alleges that the IRB convicted him of uncharged crimes in violation of the Fifth Amendment's requirement that Simpson receive notice of the charges levelled against him. (Simpson's Objections at 68.) As previously discussed, however, the IRB did not convict Simpson of uncharged crimes. On the contrary, as this Court already has found, the IRB notified Simpson of the charges against him, held a hearing regarding these charges, and concluded that the evidence supported these charges. Accordingly, this Court finds that the findings contained in the IRB Opinion and Decision are constitutionally sound.

 Simpson further maintains that the IRB unconstitutionally denied him adequate notice of the charges against him, an opportunity to prepare and present a defense to these charges, and a full and fair hearing on these charges. The United States Constitution, however, does not protect the procedural rights of union members who are subject to internal union disciplinary action. Instead, the Labor Management Reporting and Disclosure Act prescribes the safeguards to which union members are entitled during the course of internal union disciplinary hearings. 29 U.S.C. § 411. Pursuant to the LMRDA, the charged party in an internal union disciplinary hearing has the right to be "(A) served with written specific charges; (B) given a reasonable time to prepare his defense; [and] (C) afforded a full and fair hearing." *Id.* Because this Court finds that the process that Simpson received during the course of his IRB proceedings—which are internal union disciplinary proceedings—comports with LMRDA standards, this Court rejects each of Simpson's claims to the contrary.

First, this Court finds that Simpson was served with the written, specific charges against him, as well as the evidence underlying these charges. On October 5, 1994, the IRB forwarded to Simpson both the Proposed Charges against Simpson and a copy of the Chief Investigator's exhibits. (Tr. 7–8.) The Proposed Charges set forth the specific IBT Constitutional provisions Simpson was alleged to have violated and the time period in which the allegedly improper conduct took place. In addition, the exhibits detailed the evidence and the background information upon which the Chief Investigator relied in presenting his case to the IRB and the IBT. These documents satisfy, and actually surpass, the LMRDA's requirement

that Simpson be served with specific written charges against him.

Second, this Court finds that the IRB provided with Simpson ample opportunity to prepare his defense to the charges against him. As mentioned immediately above, Simpson had over two months time between the date he was served with the charges and evidence against him, October 4, 1994, and the first day of his disciplinary hearing, December 20, 1994. Moreover, the IRB accommodated scheduling requests from Simpson's attorneys in order to assure that the date of Simpson's hearing was convenient to all parties involved.

Third, this Court finds that the IRB afforded Simpson a full and fair hearing on the charges against him. Simpson's disciplinary hearing lasted two days, during which time Simpson had ample opportunity to introduce any evidence to rebut the charges against him. Simpson took full advantage of this opportunity—of the 504 pages of testimony generated during this hearing, 474 pages are devoted to the testimony of Simpson and his witnesses, and to statements made by Simpson's attorneys. In addition to this live-witness testimony, Simpson offered three volumes of exhibits into evidence at the hearing. *Id.* at 476.

Moreover, Simpson's attorneys conceded that he and his client received fair treatment from the IRB during the course of the IRB disciplinary hearing. At the conclusion of the hearing, Judge Lacey asked Simpson's attorneys about the duration and the quality of the hearing. As previously noted, in response to this questioning, one of Simpson's attorneys responded as follows:

> We felt no pressure. We understand the procedure and the mechanisms of conducting these hearings.

> And we chose not to submit every witness live knowing that the Review Board will review all of the evidence we submit, and we are not suggesting nor do we feel that we've been curtailed in any way whatsoever.

> *We've been treated fairly, and we've had an opportunity to present our evidence.*

*Id.* at 487 (emphasis added). Because the process that Simpson received from the IRB throughout his internal disciplinary hearings comports with the standards set forth by the LMRDA, and because Simpson's counsel previously admitted that the hearing was fair, this Court finds that Simpson's objection regarding this issue is meritless and should be dismissed.

 Simpson also asserts a Fifth Amendment claim on the grounds that the offense for which he was sanctioned—"bringing reproach upon the IBT," (Simpson's Objections at 68)—was unconstitutionally vague. *Id.* Teamsters subject to disciplinary hearings under the first phase of the Consent Decree made this identical claim regarding sanctions that the IA imposed on them for knowingly associating with members of organized crime. *Senese & Talerico,* 941 F.2d at 1298. In response to this claim, the Second Circuit held that "even if a regulation may be vague in certain hypothetical applications, it may still be applied to conduct that unquestionably falls within its terms." *Id.* The Second Circuit continued that "because it should have been clear to [the Teamsters] that associating with known members of organized crime would bring reproach upon the IBT, sanctioning them for these activities was not constitutionally infirm." *Id.* (citations omitted). Identical reasoning controls the instant inquiry.

Simpson was an experienced Teamster member, labor negotiator, and was President of Local 743 during the time period in question. (Tr. at 52–54.); (IRB Opinion and Decision at 30.) During the hearing, Simpson testified that he was aware of the charges contained in the complaint filed against the IBT in the civil RICO case, and he was aware that Peters was a named defendant in that case at approximately the time the complaint was filed. (Tr. at 156.) He conceded that he knew that Peters entered into an individual consent decree with the Government to settle the charges against Peters in this case, *id.* at 83, and that one of the terms of this consent decree was that Peters resign from all of his Teamster positions. *Id.* at 85–86. In addition, Simpson admitted that he involved Peters in numerous meetings and

events concerning Local 743 business. *E.g., id.* at 126–31, 141–43. In light of Simpson's experience, union position, and admitted knowledge of the facts and circumstances regarding the civil RICO case and Peters's individual settlement in that case, this Court finds that it should have been clear to Simpson that continuing to involve Peters in Local affairs during the time period at issue in this application would violate IBT rules and that such violations would bring reproach upon the IBT. Consequently, sanctioning Simpson for this conduct is not constitutionally infirm.

### E. Proportionality of Simpson's Sanctions.

Simpson's final objection to IRB Application XXI concerns the sanctions that the IRB imposed on him for bringing reproach upon the Union in violation of the IBT Constitution. Simpson contends that "the IRB's punishment of a life time bar from the IBT or any IBT-affiliated entity is unwarranted. . . ." (Simpson's Objections at 69.) He further asserts that "lifetime bans are reserved for cases far more egregious than this." *Id.* He argues that sanctions as severe as those imposed on him are only imposed in cases that "involve IBT members being member [sic] of organized crime, knowingly associating with known members of organized crime or using violence as a tool to impede political expression," *id.* at 69–70, then cites and summarizes twenty-three cases that he claims support this proposition. *Id.* at 70–76.

Simpson's objections to the sanctions imposed by the IRB are meritless. As an initial matter, Simpson has mischaracterized the sanctions that the IRB imposed on him. After finding that the charges against Simpson had been proved by a preponderance of the evidence, the IRB concluded as follows:

> Simpson's conduct makes him unfit to serve in any position of trust or responsibility within the IBT or any of its affiliates. Accordingly, Simpson is to remove himself as President of Local 743, and draw no money or compensation therefrom. Moreover, Simpson is permanently barred from

holding any position with the IBT, or any IBT–Affiliated entity in the future. As an additional safeguard, Simpson may not obtain employment, consulting or other work with the IBT, or any IBT-affiliated entity.

(IRB Opinion and Decision at 37.) As quoted above, the IRB does not bar Simpson from *membership* in the IBT, but only bars him from "holding any position" and from "obtain[ing] employment, consulting, or other work with the IBT, or any IBT-affiliated entity." *Id.*

When the IRB has sought to bar a person from IBT membership, the IRB has clearly stated its intention to "bar," "debar," or "banish," such a Teamster from union membership. *See, e.g., United States v. International Bhd. of Teamsters [Garafola],* 878 F.Supp. 14, 15 (S.D.N.Y.1995) (affirming the IRB's Opinion and Decision which "permanently debarred Garafola from the IBT"); *United States v. International Bhd. of Teamsters [Senter],* 871 F.Supp. 178, 179 (S.D.N.Y.1994) (Affirming the IRB's Opinion and Decision that "permanently debarred Senter from the IBT"); *United States v. International Bhd. of Teamsters [Rea],* 88 Cv. 4486, 1994 WL 577003, at *1 (S.D.N.Y. 1994) (affirming the IRB's Opinion and Decision that "permanently debarred Rea from the IBT"); *United States v. International Bhd. of Teamsters [Zancocchio],* 88 Cv. 4486, 1994 WL 520029, at *2 (S.D.N.Y.1994) (affirming the IRB's Opinion and Decision that "permanently debarred Zancocchio from the IBT"); *DiGirlamo,* 824 F.Supp. at 412 (affirming Independent Administrator's decision that "permanently banished DiGirlamo from the IBT"); *Ligurotis,* 814 F.Supp. at 1168 (affirming the IRB's Opinion and Decision that "permanently barred Mr. Ligurotis from the IBT"). The IRB used no such language in the penalty it imposed on Simpson, but rather specifically limited the scope of its ban to "any position," "employment, consulting and other work with the IBT, or any IBT-affiliated entity." (IRB Opinion and Decision at 37.) Because the IRB neither "banished," "barred," nor "debarred" Simpson from the IBT, nor specifically stripped him of his Union membership, Simpson retains his membership in the IBT,

and consequently, the ability to make a living working as a rank-and-file Teamster. Thus, contrary to Simpson's contention, the IRB did not impose upon him "a life time bar from the IBT," and his claim that the IRB did so is simply incorrect.

██ Simpson is further mistaken that his punishment is disproportionate to his misconduct. It is well settled that the decisions of officers acting pursuant to the remedial provisions of the Consent Decree will be overturned only when they are "arbitrary and capricious." *E.g., Cimino,* 964 F.2d at 1311–13. Clear precedent guides this Court's review of an IRB sanction under this standard.

██ The officers that preside over the disciplinary hearings pursuant to the Consent Decree are "best situated to determine and fix the penalty to be imposed on IBT members who violate the Consent Decree's disciplinary provisions." *Id.; see Wilson, Weber & Dickens,* 978 F.2d at 74. The IRB, as the court-appointed body that conducts the disciplinary hearings at issue in this case, "is best equipped to evaluate the demeanor, credibility and, ultimately, the culpability of those who appear before [it]." *DiGirlamo,* 824 F.Supp. at 418; *Ligurotis,* 814 F.Supp. at 1178. Consequently, the IRB is uniquely qualified to select and impose disciplinary sanctions that it finds appropriate to the charges proved against a Teamster in a given case. *See id.; Friedman,* 838 F.Supp. at 815; *see also Sansone,* 981 F.2d at 1372. Accordingly, in reviewing the sanctions imposed upon a Teamster by the IRB, the IRB is "entitled to great deference." *See Friedman,* 838 F.Supp. at 816; *Sansone,* 981 F.2d at 1372; *Wilson, Weber & Dickens,* 978 F.2d at 73–74.

In *Sansone,* the Second Circuit demonstrated precisely the degree of deference to which court-appointed officers are entitled in imposing sanctions upon IBT members. Robert Sansone ("Sansone") was the President of IBT Local 681 in St. Louis, Missouri, as well as an IBT International Representative. *United States v. International Bhd. of Teamsters [Sansone],* 792 F.Supp. 1346, 1348 (S.D.N.Y.1992). The Independent Administrator "found that Sansone brought reproach upon the IBT by disregarding his fiduciary

duty to investigate and act with respect to allegations and evidence that Anthony Parrino, a former Local 682 Vice President, was a member of La Cosa Nostra." *Id.* As his penalty for violating the IBT Constitution, the IRB permanently barred Sansone from holding Union office. *Id.* Despite numerous objections from Sansone, this Court affirmed the IA's decision. *Id.* at 1357. In doing so, this Court specifically rejected Sansone's contention that the sanction imposed upon him was "excessively severe," stating that

the IBT will be free from the taint of the LCN's influence only when its officers are committed to uncovering and purging the Union's connections to organized crime. IBT officers, as repositories of the membership's trust, owe the rank and file their dedicated efforts toward this goal. Sansone's repeated failure to investigate the Parrino allegations demonstrates that he is unfit to occupy a position of trust within the IBT. Barring Sansone from union office while allowing him to retrain membership in the IBT is an entirely appropriate punishment.

*Id.*

On appeal, the Second Circuit affirmed this ruling. *Sansone,* 981 F.2d at 1372. In its opinion, the court refused to substitute its judgment for that of the IA, even though the court indicated that it "might not have reached the same conclusion." *Id.* The court concluded that "the apparent discrepancy between the penalty imposed here and those imposed in other cases does not inexorably compel the conclusion that the Independent Administrator acted arbitrarily or capriciously." *Id.*

██ In light of this precedent, this Court finds that the sanction the IRB imposed on Simpson is neither arbitrary nor capricious. The voluminous record in this case and the IRB's extensive thirty-seven page Opinion and Decision demonstrate to this Court that the IRB carefully considered the evidence of Simpson's misconduct as well as the various explanations that Simpson offered in his defense. Furthermore, the IRB stated the precise reason that it chose to bar Simpson from holding office or other employment

within the IBT: "Simpson's conduct makes him unfit to serve in any position of trust or responsibility within the IBT." (IRB Opinion and Decision at 37.) Contrary to Simpson's claim that his sanctions are "unwarranted," (Simpson's Objections at 69), this Court finds that it is appropriate, proportionate, and just to sanction an IBT member and officer who has abused his positions of trust and responsibility in the Union by barring him from holding any future positions of trust or responsibility in the Union.

 Even if the IRB were not "entitled to great deference" in its imposition of disciplinary sanctions, *Friedman*, 838 F.Supp. at 816, this Court finds that no discrepancy exists between the penalty imposed on Simpson in this case and penalties imposed on other IBT members in cases involving analogous conduct. In the *Sansone* case, discussed above, an International officer and Local President was found to have brought reproach upon the Union for disregarding his fiduciary duties toward the Union, and he was permanently barred from holding Union office, but not from Union membership. *Id.* at 1372. The similarities between the offending Teamster, the charges, and the sanctions imposed in *Sansone* and in the instant case are striking, and these similarities demonstrate that the sanctions imposed on Simpson are not "totally out of line with similar cases." (Simpson's Objections at 69.) In fact, the sanctions in the instant case are entirely appropriate for a case involving an IBT officer found "unfit to occupy a position of trust within the IBT." *Sansone*, 792 F.Supp. at 1357; *see* (IRB Opinion and Decision at 37.)

The twenty-three cases that Simpson cites in support of his objection to his sanction do not require a different conclusion. In fact, these cases demonstrate that Simpson's sanction is lesser than those imposed on the IBT members in those cases. For instance, in some of these cases, IBT officers were "permanently barred from the IBT" for their misconduct. *See, e.g., Senese & Talerico*, 941 F.2d at 1294 (upholding district court's affirmance of IA's decision that President and Business Agent of IBT Locals be suspended from the IBT for life for various violations of

the IBT Constitution); *United States v. International Bhd. of Teamsters [Crapanzano & Lanza]*, 803 F.Supp. 740, 742 (S.D.N.Y. 1992) (affirming IA's decision that President and Vice President of IBT Local were permanently barred from the IBT for their membership in La Cosa Nostra); *Ligurotis*, 814 F.Supp. at 1168 (affirming IA's decision that the Secretary–Treasurer of an IBT Local be permanently barred from the IBT embezzlement, conversion, and "engaging in a pattern of conduct that allowed corruption and unlawful activity to flourish in the Local."); *United States v. International Bhd. of Teamsters [Cherilla]*, 782 F.Supp. 256, 258 (S.D.N.Y.1992) (affirming IA's decision that the Secretary–Treasurer of an IBT Local be suspended from the IBT because he knowingly associated with members of organized crime); *United States v. International Bhd. of Teamster [Cimino]*, 777 F.Supp. 1130, 1131 (S.D.N.Y.1991) (affirming IA's decision that the President and Business Agent of an IBT Local be permanently banished from the IBT for knowingly associating with members of organized crime); *United States v. International Bhd. of Teamsters [Cozza]*, 764 F.Supp. 797, 799 (S.D.N.Y.1991) (affirming IA's decision that IBT member who served as member of the IBT's General Executive Board, President of an IBT Local, and officer of other IBT entities be permanently debarred from the IBT for knowingly associating with members of organized crime); *United States v. International Bhd. of Teamsters [Salerno & Cutolo]*, 745 F.Supp. 189, 191 (S.D.N.Y.1990) (affirming IA's decision that Presidents of two IBT Local's be suspended from the IBT for life for knowingly associating with members of organized crime).

In other cases that Simpson cites to this Court, "rank and file" IBT members, not officers, also were permanently barred from the IBT. *See, e.g., Garafola*, 878 F.Supp. at 14; *Senter*, 871 F.Supp. at 178; *Rea*, 1994 WL 577003, at *1; *Zancocchio*, 1994 WL 520029, at *1; *DiGirlamo*, 824 F.Supp. at 412; *United States v. International Bhd. of Teamsters [Buckley & Morris]*, 782 F.Supp. 238, 240 (S.D.N.Y.1992). Given the fact that the sanction that the IRB imposed upon Simpson does not include revocation of his IBT membership, Simpson's sanction is less-

er than those imposed on the IBT members in the cases cited above. Accordingly, this Court finds that Simpson's objections to the sanctions imposed on him by the IRB Opinion and Decision in Application XXI are without merit.

## CONCLUSION

In conclusion, this Court finds that the IRB's decision in Application XXI regarding the disciplinary charges against Robert T. Simpson is not arbitrary or capricious. *See* IRB Rules, ¶ O ("In reviewing actions of the IRB, this Court shall apply the same standard of review applicable to review of final federal agency action under the Administrative Procedure Act."); *see also Ruane,* 1994 WL 178135, at *2. This Court finds that the manner in which the IRB used, interpreted, and evaluated the evidence presented regarding Simpson is consistent with case law governing the use, interpretation, and evaluation of evidence in internal Union disciplinary hearings conducted by the IRB. This Court finds that the IRB did not interpret Peters's consent decree as a bar order. This Court holds that the standard of review contained in the IBT Constitution governs motions to recuse IRB members, and finds that under this standard, Simpson's motion to recuse the IRB is meritless. Finally, this Court finds that both Simpson's constitutional objections to the IRB Opinion and Decision in Application XXI, and his claim that the sanctions that the IRB imposed on him for bringing reproach upon the Union are meritless.

Accordingly this Court holds that all of the objections that Simpson raises to the IRB Opinion and Decision in Application XXI are meritless, and that the IRB Opinion and Decision in Application XXI is affirmed in its entirety.

SO ORDERED.